## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**CARLTON SANDERS and**
**STEPHEN H. SMITH as Chapter 7 Bankruptcy**
**Trustee for CARLTON SANDERS**                                   **PLAINTIFFS**

**vs.**                              **CIVIL ACTION NO.:   3:19-cv-721-DPJ-FKB**

**KOCH FOODS, INCORPORATED;**
**KOCH FARMS OF MISSISSIPPI, LLC, and;**
**KOCH FOODS OF MISSISSIPPI, LLC**                              **DEFENDANTS**

## AMENDED COMPLAINT

COME NOW**,** Plaintiffs, Carlton Sanders and Stephen H. Smith, and state as follows:

## INTRODUCTION

1.      This case is brought to address race discrimination in Mississippi.  The United States Department of Agriculture ("USDA"), which regulates the poultry industry, has unequivocally found "unjust discrimination" against black farmers by the Koch Defendants, including Plaintiff Carlton Sanders, the last black farmer in Mississippi under contract with Koch.

2.      Plaintiff Sanders grew chickens for Defendants.  Defendants are chicken companies.  Chicken companies are prohibited from discriminating under the Civil Rights Act. Under 42 U.S.C. 1981(a), "all persons have the same right to make and enforce contracts as are enjoyed by white citizens, including contracts involving independent contractors."  This applies to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. 1981(b).

3.      Chicken companies are prohibited from engaging in "unfair, unjustly discriminatory or deceptive" business practices under the Packers and Stockyards Act ("PSA").

1

The PSA prohibits any livestock or live poultry dealer from:  a) engaging in or using any unfair, unjustly discriminatory, or deceptive practice or device, or; b) making or giving any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subjecting any particular person to any undue or unreasonable prejudice or disadvantage in any respect.  7 U.S.C. § 192(a) and (b).  The PSA likewise prohibits unfair, discriminatory, or deceptive practices under 7 U.S.C. § 213.  The application of the PSA in this context in this case appears to be one of first impression.

4.      The conduct of Defendants is in violation of these and other federal and state laws, including civil rights statutes, fraud, and state anti-discrimination and contract laws.

## PARTIES

5.      Plaintiff Carlton Sanders is an African American adult resident of Forest, Mississippi, and a former poultry farmer for Defendants, Koch Foods Incorporated, Koch Farms of Mississippi, LLC, and Koch Foods of Mississippi, LLC.  Sanders's farm was financed through PriorityOne Bank ("PriorityOne") in Magee, Mississippi.

6.      Plaintiff Sanders is in bankruptcy and this case is brought pursuant to the United States Bankruptcy Code for the benefit of Sanders as the debtor, and creditors (i.e., PriorityOne).

7.      Plaintiff Stephen H. Smith is the Chapter 7 Bankruptcy Trustee for Plaintiff Sanders, in the United States District Court for the Southern District of Mississippi, Jackson Division, Case Number 18-02892-NPO.

8.      Defendant Koch Foods Incorporated ("Koch Foods, Inc.") is a Delaware corporation headquartered in Park Ridge, Illinois, is the parent company of Koch Farms of Mississippi, LLC and Koch Foods of Mississippi, LLC, and is the controlling owner of Koch's

operations in Mississippi.

9. Defendant Koch Farms of Mississippi, LLC ("Koch Farms") is a limited liability corporation organized in Mississippi, with its principal address at 4688 Highway 80 East in Morton, Mississippi. Koch Farms is a live poultry dealer as defined in Section 2(a)(10) of the Packers and Stockyards Act and operates the Koch feed mill in Morton.

10. Defendant Koch Foods of Mississippi, LLC ("Koch Foods") is a limited liability corporation organized in Mississippi, with its principal address at 4688 Highway 80 East in Morton. Koch Foods is a live poultry dealer owned by Koch Foods, Inc. and operates the Koch slaughtering plant in Morton and the Live Production Division for Koch's operations in Mississippi, which contolled the growing of baby chickens by Plaintiff Sanders.

11. Defendant Koch Foods enters into the poultry growing agreements with farmers, also known as growers. Koch Foods entered into Poultry Growing Agreements (contracts of adhesion) with Plaintiff Sanders beginning in 2001 through including the one in place at the time of the events alleged herein dated March 8, 2015.

12. Defendant Koch Foods entered into "Assignments of Money to Become Due for Services Performed in Growing Poultry" agreements that Plaintiff Sanders signed with his lender, PriorityOne Bank ("PriorityOne"). Koch Foods agreed "to issue all checks for the growing of chickens" to Sanders and PriorityOne.

13. The Koch Defendants operate one of the largest vertically integrated poultry processors in the United States, with locations across Alabama, Georgia, Illinois, Mississippi, Ohio, and Tennessee.

14. The Koch Defendants are collectively referred to as "Defendant Koch" or "Koch."

3

15.     Defendant Koch processes and supplies fresh and frozen poultry products, such as bone-in and boneless chicken breasts and legs, fully prepared cooked snacks and entrees, and serves food service and retail operators worldwide.

16.     Defendant Koch advertises and packages itself as "America's Chicken Specialist:



## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

18.     This Court has supplemental jurisdiction over Plaintiffs' causes of action based on state law, pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

20.     The poultry industry is the largest income-producing agricultural commodity in Mississippi.  Total sales of poultry products by Mississippi processors in 2014 exceeded $2.87 billion, and Mississippi produced 738 million broilers in 2014.

21.     Mississippi is the fifth largest poultry producing state, with more than 1,300

chicken farms.  While the population in Mississippi is 38% black, only 96 of those farms were operated by blacks in 2012, according to the most recent available data.

22.     From 2009 to 2017, Defendant Koch went from having contracts with four black farmers in Mississippi to one, Plaintiff Carlton Sanders, to none, out of 173 Koch growers.

23.     Defendant Koch has a history of discriminating against black contract farmers in Mississippi and retaliating against those who speak out.  Investigators for the USDA have found evidence of "unjust discrimination" against Plaintiff Sanders and other black farmers by Koch.

24.     The USDA was founded in 1862 by President Abraham Lincoln as the "people's department," and one of its governmental functions is to give assistance to America's farmers.

25.     The USDA investigated the complaint of black farmer John Ingrum stretching back to 2010.  Ingrum, like Plaintiff Sanders, was subjected to a series of unlawful and unwarranted shifting demands by Koch.  Evidence compiled by the USDA shows Koch using pretextual reasons against Ingrum and other black farmers, including refusing to give or sustain contracts by saying their farms were too far away from Koch's operations, or that no new contracts were being issued, even as it was entering into new contracts with white farmers whose farms were even further away.

26.     John Ingrum was the next-to-last black farmer terminated before Plaintiff Sanders to grow for Defendant Koch in Mississippi.  Koch's similar mistreatment of Ingrum based on race (claims are too remote to be included in this suit) factored heavily into the USDA's investigations.

27.     Plaintiff Sanders was the last black poultry farmer to work under contract for Defendant Koch until Koch gave him a list of expensive renovations that no white farmer received.

28.     Plaintiff Sanders was a poultry farmer, also known as a grower, under the "Broiler Growing Agreements" (succession of contracts) to grow chickens for Defendant Koch Farms of

Mississippi, LLC and the other Koch Defendants through financing provided by PriorityOne.

29.    Plaintiff Sanders' had two poultry farms, the **Carlton Sanders Farm and Cory Sanders Farm** and seven chicken houses (collectively the "farm") in Lena, Mississippi, and had been in business since 1992.  Defendant Koch bought out Sanders's former food integrator. BC Rogers Poultry, Inc., in 2001.  The life of a poultry house typically ranges from thirty to fifty years.

30.    PriorityOne originally loaned Plaintiff Sanders's $750,000 secured by 52.8 acres of land, seven poultry houses, poultry equipment, and his home.  It subsequently loaned Sanders additional funds of almost $200,000 to meet the shifting demands of Defendant Koch for alleged upgrades and capital improvements.  Sanders successfully grew smaller birds (3.5-5 pounds) for Koch, had good credit, made timely payments, and had paid down a significant portion of the initial loan.

31.    Defendant Koch's "Live Production Manager" in Mississippi, Ronnie Joe Keyes, oversees the production of live broiler chickens before they are delivered to the Koch Slaughter Plant in Morton for processing, referred to as the "grow-out" operations.  As part of the grow-out operations, broiler chickens are delivered to and picked up on growers' farms by Koch and loaded onto poultry transport vehicles for delivery to the Slaughter Plant.  All aspects of the grower's operations are controlled and manipulated by Koch.

32.    Plaintiff Sanders was a small bird grower for Defendant Koch.  Sanders's performance for Koch was above average under the ranking ("tournament") system which Koch uses to pay the farmers, however, he was deliberately singled out by Koch because of his race.

## RELEVANT CHRONOLOGY

33.    In September 2014, Plaintiff Sanders was required by Defendant Koch to make

twenty-two worth of items or "upgrades," to his farm totaling $197,749.55.  Sanders was assured by Koch that these were all the upgrades that he would need to make, and in reliance of this, he borrowed money from PriorityOne, did the upgrades, and made his increased payments on time.

34.     On February 2, 2015, Defendant Koch told Plaintiff Sanders of an allegedly new minimum housing standards for ventilation in chicken houses relating to wind speed (to keep the birds cool in the warmer months) and minimum static pressure (to keep the birds warm in the colder months).  These minimum requirements were allegedly applicable to all of Koch's farmers.

35.     As Plaintiff Sanders grew small birds, the wind speed in his houses already met the minimum requirements.  The static pressure on Sanders's farm was only .05 apart from the .10 it needed to be, and it was going to cost Sanders about $7,000 ($1,000 a house) to make this increase.

36.     On or about October 10, 2015, Defendant Koch, through its Service Technician Todd Williams and North Broiler Manager Joe Bergin, approached Plaintiff Sanders with verbal demands that Sanders again conduct more expensive upgrades, even though they had assured Sanders in 2014 that the list then was all he was going to need to do.  Sanders asked Koch to put the list in writing.  This was also the same date that Koch delivered what was going to turn out to be its last flock of chickens to Sanders's farm.

37.     Plaintiff Sanders went back to PriorityOne to see if he could get an additional loan to pay for the new upgrades.  On October 15, 2015, PriorityOne loan officer David Farish spoke to Defendant Koch's North Broiler Manager Joe Bergin, and sent a follow-up email, asking Bergin to: "Please provide a listing of needed improvements that Koch Foods is requiring.  If possible, please include cost estimates and the projected outcome of these changes."  Neither Bergin nor Koch ever responded.  Bergin later stated in an affidavit that he did not respond because he does

not like dealing with banks.  Farish later stated that "how Koch did Sanders" was wrong.

38.     On November 4, 2015, Defendant Koch gave Plaintiff Sanders a letter mandating that he do twenty-three "upgrades" to his poultry houses, at an estimated cost of $318,000, that no white farmers were required to do.  These upgrades included items needed only for Class A flocks, although Sanders was successfully producing smaller Class B birds, and there was no requirement that he be a Class A producer (6-10 pound birds), items exceeding the requirements for Class A birds, and items needed only for brand new chicken houses versus existing ones.  This list included twenty-one more upgrades than were imposed on the white farmers, who had nine months advance notice to perform two alleged "minimum requirements" (one of which Sanders already met).

39.     Plaintiff Sanders was told by a Defendant Koch employee and others that no other farmers, who were all white, had received the same 23-item "Update list."

40.     Defendant Koch used "animal welfare" and "mandatory" upgrades, including upgrades exceeding what was needed for larger Class A birds, and for equipment and changes only required for brand new chicken houses, as pretexts for making the discriminatory demands and cutting off the flocks of birds that Plaintiff Sanders had efficiently raised for years and depended on for his livelihood.

41.     Koch itself has a history of treating its chickens inhumanely, including delivering sick and dead chickens to farmers to "grow," delivering the wrong feed, not enough feed, or no feed during the chickens critical three main stages of growth (essentially starving the chickens, as the farmers are obligated to use the feed provided to them by Koch), or of spilling feed upon delivery, thereby shorting the chickens of food and causing rodent problems for the farmers.

42.   The November 4, 2015 letter that Defendant Koch gave Plaintiff Sanders reads

*verbatim* as follows (redacted by the USDA at, upon information and belief, Koch's request):

**Koch Foods of MS**

November 4, 2015

To Whom It May Concern:

Update list on Carlton and Cory Sanders Farm:

1)  Controllers, Rotem, and back up system
2)  All fans need to be upgraded to all J2 fans and add 1 to each house for a total of 10.
3)  Must have 2" water line from the road to control room
4)  Evaluate and repair all baffles.
5)  LED lights with dimmer (all 3 lines).
6)  Solid side wall with spray foam or tin with bubble wrap.
7)  Patch tri-ply and replace insulation as needed.
8)  Must have 60 BTU's in brood end and 30 on the off end. (For Carlton need 12 on front end and
    6 on back end) (For Cory Sanders 12 on front end and 7 on back end).
9)  Add tunnel machine and vent machine.
10) Add 15 feet of cool cell to both sides.
11) Check all breakers and breaker boxes for replacement
12) Must have a static pressure of .10 with one 48" fan.
13) Must have a wind speed of 650 FPM.
14) Service generator.
15) Replace all feed bins and feed bin boots as needed.
16) Replace all tin on outside of the bottom of houses.
17) Replace cross fill system and evaluate all feed line motors.
18) Must have a 200 amp breaker pre house with no double main.
19) All brooders must be direct spark and tied to controller
20) Replace vent door insulation
21) Must have 2 sources of water.



Live Production Mgr.          North Broiler Mgr.          Service Technician

43.   The November 4, 2015 letter from Defendant Koch Foods oddly addressed, *To

Whom It May Concern*, is entitled, *Update list on Carlton and Cory Sanders Farm.*  However, on

March 17, 2016, in an email to the USDA, Defendant Koch, through its attorney, in a flat out

contradiction, twice denied that any of these items were "update requests," claiming instead that

they were just "minimum specifications for broiler housing that would become effective for placements on or after November 1, 2015."

44.     Plaintiff Sanders was already in compliance with one of the two alleged minimum specifications (wind speed) that he was told he needed in February 2015, yet it was included in the November 4, 2015 "Update list."  The items listed also improperly included specifications that exceeded what was even required for Class A birds, even though Sanders was a Class B (smaller bird) grower, included specifications for building brand new chicken houses, which Sanders was not building, and would have cost over $318,000 to do, when, as stated, only about $7,000 was needed for Sanders to meet the minimum requirements being imposed on the white farmers.

45.     Plaintiffs Sanders had been a successful grower for years, so the conduct by Defendant Koch, in conjunction with the misrepresentations made by Koch in the March 17, 2016 email, demonstrate both a discriminatory motive and pretextual conduct to hide Koch's racial bias and discrimination.  To the extent retaliation must be proven as well, Koch dumping demands to be performed immediately for twenty-three upgrades at a cost over $318,000 on Sanders in 2015, after he had already complied with almost $200,000 worth of upgrades just the year before in 2014 (but much to Koch's dismay did not give up), constitutes retaliation.

46.     After Plaintiff Sanders brought the November 4, 2015 Update letter to PriorityOne, and  PriorityOne  attempted  unsuccessfully  to  get  more  concrete  information  from  Koch, PriorityOne's senior executives conferred with Koch and decided to refuse to loan Sanders any more money.  PriorityOne's loan officer, David Farish, was forced to tell Sanders that he should sell his farm instead.  As PriorityOne refused to voluntarily participate in the USDA's investigation without a subpoena once it learned that it was about discrimination, a subpoena is needed to get

10

the documents to get to the truth about what transpired between PriorityOne and Koch.

47.     On November 20, 2015, Defendant Koch picked up the last flock of chickens grown by Plaintiff Sanders from Sanders's farm.  This was the same flock of chickens that had been delivered to Sanders's farm on or about October 10, 2015.  Once Koch stopped giving Sanders chickens to raise, Sanders's income came to an abrupt halt and he had no means of paying back his loans to PriorityOne.  Since PriorityOne was paid directly from Koch through the assignment of benefits, if there was no income, there was nothing to assign.

48.     Thus, when Koch delivered its last flock of chickens to Plaintiff Sanders on or about October 10, 2015, with an impossible ultimatum that no white farmer received, it was a foreseeably devastating and fatal blow to Sanders's ability to operate his poultry farm and stay in business.

49.     In December 2015, Sanders filed a race discrimination complaint with the USDA. The discriminatory conduct of Defendant Koch put Plaintiff Sanders under enormous financial pressure, wreaked havoc on his health (causing a stroke and heart attack) and personal life, including a divorce, and caused PriorityOne to deny loaning Sanders the money he needed to meet the unrealistic and instantaneous demands for expensive upgrades unlawfully perpetuated by Koch on Sanders, and resulting in bankruptcy, foreclosure, and the loss of Sanders's farm and home.

50.     In its investigation continuing from December 2015 through May 8, 2019, the USDA, through the Agricultural Marketing Service, Fair Trade Practices Program, Packers and Stockyards Division, investigated the claims raised by Plaintiff Sanders.

## THE USDA'S INVESTIGATIONS

51.     Koch's has engaged in a pattern and practice of discrimination against black farmers.  Over the years, the USDA had collected affidavits attesting to Defendant Koch

employees' calling black farmers "n****rs" (full spelling not used out of respect) and observed that the Koch office staff was all white.   In addition, the Equal Employment Opportunity Commission (EEOC) sued Koch for sexual harassment, retaliation and discrimination against Hispanic employees in Mississippi, and Koch paid $3.75 million in 2018 to settle the lawsuit.

52.     In February 2016, the USDA notified Defendant Koch that it was investigating a new complaint it had received, without mentioning Plaintiff Sanders.   Koch responded by criticizing the condition of Sanders's farm and, at the same time, denied that Koch asked farmers to make "upgrades."   Koch responded similarly to calls from Congressmen, Congresswomen, and Senators and/or their staffers on Capitol Hill following a trip by a group of farmers, including Sanders, to Washington, D.C. on July 15-17, 2019.   Koch degraded Sanders further by telling the callers that Sanders was a poor grower and gambled his money away.   Sanders does not gamble and has never been inside a casino.

53.     On July 12, 2016, Defendant Koch's North Broiler Manager Joe Bergin wrote a letter, *To Whom It May Concern*, instructing: "Please remove Carlton Sanders from all rankings and the broiler housing list due to the no activity on his farm since November 20, 2015."

54.     In its investigation of Plaintiff Sanders's complaint, the USDA asked about the 23-item "Update list" dated November 4, 2015 that only Sanders received, and Defendant Koch responded by telling the USDA that these items were "optional."   However, the list from Koch used the word "must" six times and never said the updates were voluntary.   Despite the clear meaning of the unequivocal demands Koch placed upon Sanders, Koch subsequently claimed a contrary meaning to the word "must" that has a single definition and usage in the English language.

55.     The USDA asked to schedule a meeting with Defendant Koch's executives to present its findings.  Koch suggested that the USDA meet with local managers instead, but the USDA insisted on speaking with the top executives "due to the potential gravity of the situation."

56.     In July 2017, investigators with the USDA met in Birmingham, Alabama, with Defendant Koch's chief operating officer, along with two other executives and the company lawyer.  Despite Koch's assertion of the "potential gravity of the situation," Joseph Grendys, Koch's multi-billion-dollar owner, did not attend the meeting in Birmingham, but was sent a copy of the USDA's slide presentation.

57.     In the presentation in July 2017, the USDA said that Defendant Koch's actions toward Plaintiff Sanders, combined with its treatment of John Ingrum and the other African American farmers, was "evidence of unjust discrimination."

58.     On August 17, 2017, a Defendant Koch's employee saw Plaintiff Sanders at the Forest Walmart parking lot.  Sanders asked him when he would get his update list to get chickens back, as the Koch vet had inspected Sanders's farm and was to give Sanders's an update list.  The employee told Sanders that he had to "pull a static pressure of .10 to keep growing" and he "knew nothing else."

59.     When the USDA presented its findings to the Defendant Koch's executives in July 2017, the evidence of discrimination was included, as well as a narrower violation:  that Koch failed to notify Sanders as to why it had stopped delivering chickens to his farm, as required under the PSA's 90-day notice requirement set forth in 9 CFR § 201.100(h).  This notice requirement is also applicable under Mississippi common law requiring a reasonable notice of the termination of a contract, and at least one federal judge in Mississippi has agreed that 90 days is reasonable.

60.     In response to the USDA's finding of no notification to Plaintiff Sanders, Defendant Koch asserted that the general notification allegedly sent to all farmers nine months earlier, in February 2015, about the new ventilation requirements (wind speed and static pressure) was enough to give Plaintiff Sanders notice that Koch would be cutting off his chickens in November.

61.     While the USDA's investigation was "ongoing" and the agency was coordinating with the Department of Justice ("DOJ"), the USDA attempted to mediate between Defendant Koch and Plaintiff Sanders.  In the months following the USDA's presentation in July 2017 to Koch's executives, the USDA negotiated with Koch to resume delivering chickens to Sanders' farms.

62.     Defendant Koch responded with a list of ten repairs that Plaintiff Sanders would need to make before Koch would resume delivering chickens.  Seven were among the twenty-three upgrades that Koch had previously insisted were optional.

63.     The USDA sought an assurance from Defendant Koch that if Plaintiff Sanders borrowed and spent the money to make the latest ten repairs, Koch would resume bringing Sanders's chickens (to avoid an exercise in futility).  Koch would not agree.  Koch would only agree to be "reviewing its policies and programs," meaning it would do and did nothing.

## THE USDA'S FINDINGS

64.     In two responses to Freedom of Information Act ("FOIA") requests for Plaintiff Sanders totaling almost 1,100 pages, the USDA twice unequivocally found "unjust discrimination and undue or unreasonable prejudice or disadvantage" by Defendant Koch against Sanders.

65.     The USDA Investigative Report dated November 25, 2016 found as follows:

United States Department of Agriculture
Grain Inspection, Packers and Stockyards Administration
Packers and Stockyards Program (P&SP)
Eastern Regional Office

14

75 Ted Turner Drive, S.W., Suite 230
Atlanta, GA 30303

## Investigative Report

| Date of Report | Control Number: | Prepared By: |
|---|---|---|
| 11/25/2016 | [] | **(b)(6), (b)(7)(C)**[1] Investigative Attorney |

RESPONDENTS:

**KOCH FOODS, INC.**
**1300 West Higgins Road, Suite 100**
**Park Ridge, Illinois 60068**

**KOCH FARMS OF MISSISSIPPI, LLC, and**
**KOCH FOODS OF MISSISSIPPI, LLC**
**1080 River Oaks Drive, Suite A-100**
**Flowood, Mississippi 39232**

## UNJUST DISCRIMINATION AND
## UNDUE OR UNREASONABLE PREJUDICE OR DISADVANTAGE

**SYNOPSIS OF FACTS:**

Carlton Sanders, an African-American poultry/broiler grower who had poultry growing arrangements with Koch Farms of Mississippi, LLC, to grow poultry on his two farms (the Carlton Sanders Farm and the Cory Sanders Farm), alleged that he was being discriminated against by Koch's requirement that he make expensive upgrades and capital improvements to his farms.  Mr. Sanders claimed that other poultry growers were not being required to make the upgrades and improvements being required of him.

Investigative Attorney **(b)(6), (b)(7)(c)** conducted an investigation of Mr. Sanders' allegations from February through November 2016.  The investigation disclosed that Carlton Sanders made capital improvements to his two farms in 2014 and 2015, which were financed through loans he secured from PriorityOne Bank.

In February 2015, Koch notified its broiler growers that Wind Speed and Static Pressure requirements were being increased, and that the new Static Pressure specifications had to be implemented by November 1, 2015.  Prior to the November 1, 2015, deadline, Carlton Sanders spoke with **(b)(6), (b)(7)**, a loan officer at PriorityOne Bank.  **(b)(6)** sent an email to **(b)(6), (b)(7)**, a Koch Broiler Manager, stating that they had just spoke on the telephone, and asking

---

[1] The FOIA search results provided by the USDA are heavily redacted.  The second search results were provided on September 11, 2019.  Plaintiffs are appealing the redactions and will also seek an unredacted copy in discovery, as the redactions were made, upon information and belief, at the request of Koch.

**(b)(6), (b)(7)** to provide him with information about what Sanders was being required to do by Koch on his farms.  **(b)(6), (b)(7)** received the email from **(b)(6)**, but did not respond to **(b)(6), (b)(7)** via email, and claimed that he never read the email from **(b)(6)**.

On November 4, 2015, **(b)(6), (b)(7)** wrote a letter, signed by **(b)(6), (b)(7)**, Koch's Live Production Manager, and by the Koch Service Technician assigned to Sanders' farms,  addressed to "To whom it may concern," and provided a list of 23 upgrades for Sanders' two farms.  No other poultry growers under contract with Koch received a similar letter.  The letter did not state that the 23 upgrades were voluntary on Sanders' part and contained the word "must" six times. Sanders and a farm worker employed by Sanders state that Sanders was told by Koch managers **(b)(6), (b)(7)*** and **(b)(6), (b)(7)(C)** that the 23 upgrades were mandatory, and that Sanders would receive no further poultry on his farm until all 23 upgrades were made.  **(b)(6)**, PriorityOne Bank, received a copy of the letter and stated that he assumed that was Koch's response to his October 15, 2015, email to **(b)(6), (b)(7)***.

Sanders obtained estimates for the 23 upgrades and submitted them to PriorityOne Bank.  Due to the recent loans extended to Sanders for other upgrades, the bank did discouraged Sanders from applying for another loan.  Sanders spoke with other Koch broiler growers, who told him that they were not being required to make such expensive upgrades.  Sanders reported that the distress that he suffered from this situation resulted in his having cardiovascular trouble, and he decided to quit growing poultry for Koch and to try to obtain a poultry growing arrangement with another poultry company.

**(b)(6), (b)(7)(A), (b)(7)(C) [Whole paragraph redacted].**

Prior to 2010, Koch had contracts with four African-American poultry growers operating a total of six different farms to raise broilers.  Currently there are no African-American poultry growers who have a contract with Koch, out of 173 broiler growers.

**Entity Response:**  Koch managers stated that the list of 23 upgrades were delivered to Sanders per Sanders' request, because he expressed an interest in upgrading his two farms so that they met Class A specifications, by which he would be paid a higher average amount of money per pound of live poultry.  Koch managers deny that they ever told Sanders that the 23 upgrades were required, and state that Sanders was told that he was required to increase his Static Pressure to meet the new specifications in order to receive poultry on his farms.

66.    The items set forth in Paragraph 65 containing the USDA's Investigative Report

dated November 25, 2017 are true.

67.    The USDA Supplemental Investigative Report dated May 8, 2019 found as follows:

United States Department of Agriculture
Grain Inspection, Packers and Stockyards Administration

Packers and Stockyards Program (P&SP)
Eastern Regional Office
75 Ted Turner Drive, S.W., Suite 230
Atlanta, GA 30303

**Supplemental Investigative Report**

| Date of Report | Control Number: | Prepared By: |
|---|---|---|
| 05/8/2019 | [] | **(b)(6), (b)(7)(C)**<br>Investigative Attorney |

RESPONDENTS:

KOCH FOODS, INC.
1300 West Higgins Road, Suite 100
Park Ridge, Illinois 60068

KOCH FARMS OF MISSISSIPPI, LLC, and
KOCH FOODS OF MISSISSIPPI, LLC
1080 River Oaks Drive, Suite A-100
Flowood, Mississippi 39232

**UNJUST DISCRIMINATION AND
UNDUE OR UNREASONABLE PREJUDICE OR DISADVANTAGE**

**SYNOPSIS OF FACTS:**

In a previous case file, ECM Folder # [], evidence was found that Respondents engaged in unjust discrimination and undue or unreasonable prejudice or disadvantage against Carlton Sanders, an African-American poultry/broiler grower who had poultry growing arrangements with Respondent Koch Farms of Mississippi, LLC.

**(b)(5) Attorney Client Privilege (ACP), (b)(5) Deliberative Process Privilege (DPP)**
[Whole paragraph(s) redacted].
**(b)(5) ACP, DPP**

The Supplemental Investigation disclosed:

    A.  Mr. Sanders stated in his Affidavit dated September 20, 2018, that he never received the Broiler Service Reports for either the Carlton Sanders Farm or the Cory Sanders Farm that are dated December 4, 2015, and December 18, 2015;

    B.  Mr. Sanders stated in his Affidavit dated September 20, 2018, that he received the Broiler Service Reports for both the Carlton Sanders Farm and the Cory Sanders Farm that are dated January 1, 2016 and January 11, 2016, and that those Report

were hand delivered to him by Koch Broiler Service Technician Todd Williams;

C. The 2015 Broiler Service Reports and other live production records regarding the Carlton Sanders and Cory Sanders Farms show basically routine operation of both farms in broiler production.  Occasional mention is made of a strong smell of ammonia, but the records show that it was eliminated with increased ventilation;

D. Of the 23 upgrades items listed in Koch's upgrades list for the Carlton Sanders and Cory Sanders Farms dated November 4, 2015, six of the requirements appear to exceed what was required of Class "A" housing, including:  1) a Wind Speed of 650 FPM (only 550 FPM was required for Class "A" Houses, and 650 FPM was required of New Housing); 2) the replacement of working fans with J2 fans; 3) the installation of two-inch water lines; 4) the installation of LED lights (more expensive than incandescent and fluorescent lighting); 5) the addition of solid state walls, which are very expensive to add); and 6) the installation of stir fans;

E. Two individuals who are African-American were identified who have attempted to obtain poultry growing arrangements with Koch, but who were denied contracts.  These individuals were identified through outreach efforts to the Mississippi State Conference of the NAACP.  Affidavits were obtained from both individuals.  **(b)(6), (b)(7)(c)** stated that he has tried to obtain a contract since 2005, but that he has been told by Koch employees that his property is located too far away, and that no new growers were being contracted with.  However, as of May 2010, Koch contracted with eight poultry growers who are even further from its feed mill than **(b)(6), (b)(7)(c)** property.  As of March 2019, that number had increased to 10.  Also, between January 2005 and March 2019, Koch entered into approximately 165 new broiler production contracts with white individuals or firms controlled by white individuals; and

F. A Consent Decree was entered by the U.S. District Court, Southern District of Mississippi, on July 31, 2018, in the lawsuits brought by the U.S. E.E.O.C. and employees at Koch's slaughter plant at Morton, Mississippi.  Although not admitting to any wrongdoing, Koch agreed to pay $3.75 million in damages to employees for gender, racial, and/or national origin discrimination and retaliation, agreed to injunctive relief and mandatory training of its plant supervisors, managers, and employees, and agreed to do a full EEO policy review.

68.     The items set forth in Paragraph 67 containing the USDA's Supplemental Investigative Report dated May 8, 2017 are true.

69.     On June 29, 2016, PriorityOne refused to cooperate with the USDA without a court subpoena, even though it was initially cooperative until the issue of discrimination was raised.

70.     The Broiler Growing Agreement with Plaintiff Sanders has never been lawfully terminated, even though Koch unlawfully breached the contract by failing and refusing to provide Sanders with chickens, causing Sanders to default on his loan with PriorityOne, which in turn caused the foreclosure on his home and farm.

71.     On September 21, 2017, an investigator for the USDA wrote to Defendant Koch that: "Koch has never, to our knowledge, given notice to Mr. Sanders that his contracts on the Cory Sanders Farm or the Carlton Sanders Farm have been terminated or will not be renewed, so both contracts remain in place."

72.     Plaintiff Sanders was forced into bankruptcy by Defendants in 2018.  At that time, he owed approximately $258,049 to PriorityOne.  On May 8, 2019, Sanders's home, farm and land (the "Property") was sold by Priority One to A1-Free Properties, LLC, for under $129,000, including two generators.  A1-Free Properties, LLC is located at 272 Lacey Road in Carthage, Mississippi, and its sole Manager and Member is Matthew Freeny.  Matthew Freeny owns at least nine various companies listed on the Mississippi Secretary of State website, including construction, investment property, timber, and trucking companies.

73.     PriorityOne sold Plaintiff Sanders's Property to Matthew Freeny, who is a relative of Shirley Freeny, a Live Production Manager at Defendant Koch Farms in Forest, Mississippi, and is the counterpart and colleague of Sanders's Live Production Manager, Ronnie Joe Keyes. Shirley Freeny's husband is Joey Freeny, who also works for Koch Farms overseeing the truck drivers and catchers, and works at the Koch plant in Morton, Mississippi, where the slaughterhouse is located.  This transaction gives the appearance of impropriety and involves improper, illegal and unethical conduct on the part of the involved parties, including Koch.

74.     Defendant Koch orchestrated the demise of Sanders, so that relatives of Koch employees could buy Plaintiff Sanders's Property for over $21,000 less than Sanders's son, Cory M. Sanders offered to pay for it.  Cory Sanders offered to buy the Property from PriorityOne for $150,000 with a loan approved for him by Regions Bank.  The offer was presented by Regions Bank to PriorityOne.  However, PriorityOne rejected the offer and instead increased the price to $300,000 for the Property, effectively blocking the sale and the pre-approved loan by Regions.  PriorityOne sold Sanders's Property to Matthew Freeny, a relative of Koch employees, for over $171,000 less than what it insisted Cory Sanders should pay for it.

75.     The Property bought by Matthew Freeny through his company, A1-Free Properties, LLC, for under $129,000, including two generators, is presently priced by him for sale online for $239,000 (a $109,000 mark-up) and is being marketed as a "beautiful traditional style home on 54 acres of rolling farmland near the town of Lena."

76.     As a result of the conduct of Defendant Koch, Plaintiff Sanders lost his home, farm and livelihood, suffered serious health consequences, including a stroke and heart attack, lost his wife to divorce, endured relentless stress and pressure, was forced into a Chapter 7 Bankruptcy, endured the profound impact of ongoing race discrimination, and retaliation for not complying with Koch's impossible demands, and has been stereotypically reduced to living on food stamps and food caught through fishing and hunting for his main sustenance.

77.     Defendant Koch, and its employees, acted illegally and unconscionably in a manner that prevented Plaintiff Sanders from growing chickens in a fair and profitable manner, subjecting Sanders to agricultural servitude, akin to the abuses subjected to Sanders's ancestors, who were slaves brought over from Africa against their will by the colonists.  All

this conduct toward Plaintiff Sanders was due to his race.

78.     Defendant Koch subjected Plaintiff Sanders to a series of continuing, related and intervening discriminatory acts (violations), including, *inter alia*, when Koch:  a) on October 10, 2015, delivered its last flock of chickens to Sanders's farm; b) refused to respond to PriorityOne's October 15, 2015 email asking for the specific items needing upgrades; c) gave Sanders the November 4, 2015 Upgrade letter and imposed twenty-three demands on him; d) refused to bring any more flocks of chickens to Sanders on November 20, 2015; e) issued the letter on July 12, 2016 saying to remove Sanders from all rankings and the broiler housing list; f) made misrepresentations during the USDA's investigation; g) refused in the summer and fall of 2017, including on September 21, 2017, to supply chickens to Sanders even if Sanders complied with ten specific agreed upon upgrades negotiated for him by the USDA; h) never to date gave Sanders's lawful notice of the termination of the Poultry Growing Agreement, including the date of the recent sale of the property in 2019 to an investor; i) upon information and belief, instructed PriorityOne to not loan Sanders the money for the twenty-three upgrades, and; j) upon information and belief, instructed PriorityOne to refuse attempts by Regions Bank to loan Sanders's son money to buy Sanders's farm out of foreclosure for $150,000 ($21,000 more than what was paid by the relative of Koch employees).

79.     As the chronology (pages 183-186 of the USDA's first investigation report) and many other pertinent parts of the USDA investigations are redacted, Plaintiffs reserve the right to seek claims against Defendant Koch under Title VI, 42 U.S.C. § 2000d *et seq.*, of the Civil Rights Act.  Section VI prohibits race discrimination in programs and activities receiving federal financial assistance because public funds, to which taxpayers of all races contribute, should not be spent in

a manner which "encourages, entrenches, subsidizes or results" in racial discrimination.  Koch receives public funding, directly or indirectly, from several federal programs, including the Small Business Administration ("SBA"), the USDA's Farm Service Agency ("FSA"), and others.

80.     Plaintiffs likewise reserve the right to bring claims under Section 1983 of the Civil Rights Act, 42 U.S.C. § 1985, *et seq.* (prohibiting conspiracies to discriminate), and any other relevant statutes and laws.

81.     Due to the illegal, racially discriminatory and tortious conduct directed toward Plaintiff Sanders, Sanders is entitled to recover compensatory, contractual, extra-contractual, and punitive damages, attorney fees and expenses, costs arising from the bankruptcy litigation, and all amounts due under applicable state and federal statutes.

## COUNT 1
## SECTION 1981 OF THE CIVIL RIGHTS ACT (CONTRACTS)

82.     Plaintiffs re-allege and incorporate all Paragraphs contained in this Complaint.

83.     Defendant Koch's actions toward Plaintiff Sanders violated Sanders's right to be free of racial discrimination under 42 U.S.C. § 1981 of the Civil Rights Act.

84.     42 U.S.C. 1981(a) of the Civil Rights Act provides that all persons have the same rights to make and enforce contracts as are enjoyed by white citizens.  Section 1981 embraces all contracts including those arising from an independent contractor relationship.  42 U.S.C. 1981(b) applies to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

85.     Defendant Koch entered into multiple Broiler Growing Agreements with Plaintiff Sanders, contracts of adhesion, and was obligated to perform under the Agreement dated March 3, 2015, when the violations alleged herein occurred.  Koch was aware that the series of racially

discriminatory acts that it committed against Plaintiff Sanders violated Section 1981 of the Civil Rights Act and was additionally motivated to benefit its employees and their relatives through the sale of Sanders's farm.

86.     Defendant Koch intentionally and deliberately discriminated against Plaintiff Sanders because of his race, African American, and Koch engaged in a pattern and practice of unjust and prejudicial conduct toward Sanders, including, but not limited to the following:

a.     Imposing false, unlawful, unrealistic, and illegitimate demands under an impossible timeline and at an exorbitant cost under a threat of termination on Sanders that no other farmer, all white, received or was expected to achieve.

b.     Failing to provide legitimate reasons for the termination of Plaintiff Sanders's Broiler Growing Agreement ("BGA") based on Sanders's race, and giving unlawful, pretextual, and false reasons for the termination.

c.     Refusing to provide reasonable assurances of reinstatements of supplies of birds.

d.     Providing false and misleading information to Sanders regarding the 23-Upgrade letter, forcing upgrades exceeding Class A specifications when none were required and forcing new building requirements on Sanders's existing farm, and forcing Sanders to perform twenty-three upgrades in a matter of weeks under an unlawful threat of termination versus giving the white farmers nine months to complete two.

e.     Failing to provide timely written notice of upgrade requirements and of lawful notice that it was terminating the BGA, which was the date it provided Sanders with the written Class A specifications for a Class B farm, listed specifications that exceeded what was needed for Class A, and new construction poultry houses specifications for an existing farm, or at any subsequent point and beyond.

f.     Violating the PBA and PSA with Sanders in a number of other ways based on his race, and retaliation based on the impossibility of Sanders's complying with the impossible demands that far exceeded what Sanders's was obligated to do under the PGA or that any other farmer, all white, had to do, reneging on its promise that the 2014 were all that was required, and all relevant federal and state contract laws.

87.     Defendant Koch denied Plaintiff Sanders the right to make and perform his Broiler Growing Agreement with Koch on the same basis and for the same compensation as it did for white farmers.  Koch also imposed unrealistic and unlawful demands on Sanders that it did not impose on white farmers and imposed these unlawful demands under an impossible timeline and at an exorbitant cost that no white farmer or any farmer could possibly fulfill.

23

88.    Defendant Koch improperly breached its Broiler Growing Agreement with Plaintiff Sanders by creating false reasons to justify its refusal to provide Sanders with chickens, which caused Sanders to lose his livelihood, default on his loans with PriorityOne, have his farm and home foreclosed on and sold to a relative of Koch employees, and put his life and health in jeopardy, all of which were foreseeable and due to the deliberate conduct on the part of Koch.

89.    As a further result of the racially discriminatory actions of Defendant Koch against Plaintiff Sanders, Sanders suffered emotional distress and serious health consequences, including a stroke and a heart attack.  He lost his wife to divorce, endured relentless stress and pressure, suffered severe emotional distress, was forced into Chapter 7 Bankruptcy where he lost everything, and has suffered the profound impact of discrimination by Defendants.

90.    As a result of Defendant Koch's deliberate wrongful motives and actions directed toward Plaintiff Sanders due to his race, African-American, Sanders has been reduced to living on food he catches or kills by fishing and hunting and food stamps for his main sustenance, painting Sanders into a stereotypical picture about race created by Koch and continuing through July 2019.

91.    Defendant Koch's racially discriminatory actions against Plaintiff Sanders, ratified by Koch during the USDA investigation, and as fully outlined herein, violated Section 1981 of the Civil Rights Act, and other civil rights violations under all application civil rights federal and state statutes.  To the extent that ratification needs to be specifically plead as a separate cause of action, this claim is herein asserted.

## COUNT II
## PACKERS AND STOCKYARDS ACT AND USDA REGULATIONS

92.    Plaintiffs re-allege and incorporate all Paragraphs contained in this Complaint.

93.    7 U.S.C. § 209(a) of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 181-229c,

provides:

> (a) If any person subject to this chapter violates any of the provisions of this chapter, or of any order of the Secretary under this chapter, relating to the purchase, sale, or handling of livestock, the purchase or sale of poultry, or relating to any poultry growing arrangement or swine production contract, he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

94.     7 U.S.C. 228 of the PSA provides that: "The Secretary may make such rules,

regulations, and orders as may be necessary to carry out the provisions of this chapter…."

95.     The 2008 Farm Bill modified the PSA by pertinently providing:

> USCA § 228 NOTE SEC. 11006. REGULATIONS.  As soon as practicable, but not later than 2 years after the date of the enactment of this Act, the Secretary of Agriculture shall promulgate regulations with respect to the Packers and Stockyards Act, 1921 (7 U.S.C. 181 et seq.) to establish criteria that the Secretary will consider in determining- (1) whether an undue or unreasonable preference or advantage has occurred in violation of such Act; (2) whether a live poultry dealer has provided reasonable notice to poultry growers of any suspension of the delivery of birds under a poultry growing arrangement; (3) when a requirement of additional capital investments over the life of a poultry growing arrangement or swine production contract constitutes a violation of such Act; and (4) if a live poultry dealer or swine contractor has provided a reasonable period of time for a poultry or a swine production contract grower to remedy a breach of contract that could lead to termination of the poultry growing arrangement or swine production contract.

Food, Conservation, and Energy act of 2008, PL 110– 246, June 18, 2008, 122 Stat 1651.

96.     Defendant Koch's November 15, 2015 letter forcing Plaintiff Sanders to conduct

twenty-three upgrades violated 9 C.F.R. § 201.216, and other relevant sections of the PSA,

regulations that were specifically promulgated in response to the 2008 Farm Bill.  This was

especially so since white farmers were only required to comply with two minimum requirements

(wind speed and static pressure), one of which Sanders was already in compliance with (wind

speed), and the others imposed on Sanders would have cost him approximately $318,000, as

opposed to about $7,000 to increase his static pressure by .05.

97.     Defendant Koch's actual termination of Plaintiff Sanders's Broiler Growing

Agreement without lawful notice and by ceasing to provide chickens under the Agreement violated 9 C.F.R. § 201.216 and other relevant sections of the PSA.

98.     Defendant Koch violated 9 C.F.R. § 201.200(a), and other sections of the PSA, by failing to provide a timely true written copy of the twenty-three upgrades to Plaintiff Sanders on the date that Koch provided the white farmers with only two new requirements for static pressure and wind speeds, one of which Sanders was already in compliance with.  This violation was especially egregious because of the contradictory information Koch provided Sanders in forcing additional expensive upgrades on Sanders and no other farmers (all white), to be performed instantaneously (as opposed to over the nine months that the white farmers had to perform two minimum requirements), on top of the expensive upgrades already imposed by Koch on Sanders, and included upgrades that were only applicable to or exceeded specifications for Class A birds, and building requirements for brand new chicken houses, neither of which applied to Sanders.

99.     Defendant Koch imposed twenty-one additional upgrades on Plaintiff Sanders and no white farmers that would cost Sanders over $318,000, versus about $7,000 to bring his static pressure up.  Koch knew that Sanders did not have the money and that he would have to try and borrow it from PriorityOne, which Koch paid monthly through an "Assignment of Money to Become Due for Services Performed in Growing Poultry."  Koch knew each time it asked Sanders to make one more repair or do one more upgrade he would need to add to his debt, and that it was contrary to its earlier promises to Sanders that if he completed the earlier round of costly upgrades totaling almost $200,000, he would be done.

100.    As Plaintiff Sanders's wind speed was accurate, the only possible minimum upgrade requirement for Sanders was raising his static pressure from .05 to .10, which was only

going to cost about him about $1,000 a poultry house, or about $7,000 total.  This was as compared to the over $318,000 in upgrades imposed on Sanders by Koch in its 23-Upgrade letter dated November 4, 2015 (the same date Koch told Sanders that it was cutting off his supply of chickens), which was approximately $311,000 more in upgrades than Sanders needed on his houses.

101.     Defendant Koch's failure to provide legitimate and lawful reasons for the termination of chickens on Plaintiff Sanders's farms, irrespective of its Broiler Growing Agreement with him or for reasons consistent with the PSA termination provision, violated 9 C.F.R. § 201.100 and other relevant sections of the PSA.

102.     The terms of the Broiler Growing Agreement, including the termination provision, violate 9 C.F.R. § 201.100, and other relevant sections of the PSA, regulations that were specifically promulgated in response to the 2008 Farm Bill.

103.     The November 4, 2015 letter from Defendant Koch mandating twenty-three upgrades, and other pretextually and discriminatorily motivated reasons given verbally, in writing and found to be true by the USDA, for Koch stopping the delivery of birds on Plaintiff Sanders's farm on or about November 20, 2015 are false and misleading, and are in contravention of 9 C.F.R. § 201.53, and other relevant sections of the PSA.  Koch ratified its wrongful conduct during the USDA investigation.

104.     If Defendant Koch contended that Plaintiff Sanders breached his respective Broiler Growing Agreement, Koch was required to provide proper notice to Sanders in compliance with 9 C.F.R. § 201.217 and other relevant sections of the PSA.  Koch has already admitted multiple times that it never gave this lawful notice.

105.     Defendant Koch never provided notice to Plaintiff Sanders of an alleged breach of

his Broiler Growing Agreement as required by or in compliance with 9 C.F.R. § 201.217, and other relevant sections of the PSA.

106.    Plaintiff Sanders is entitled to damages arising out of Defendant Koch' breaches of the USDA regulations, including, *inter alia*, loss of anticipated profits of greater than $75,000,00, costs of completed upgrades, diminution in property value, loss of equity, interest, attorneys' fees and costs of litigation, bankruptcy costs, and other compensatory and special damages.

## COUNT III
## PACKERS AND STOCKYARDS ACT, 7 U.S.C. § 192 AND 7 U.S.C. § 213

107.    Plaintiffs re-allege and incorporate all Paragraphs contained in this Complaint.

108.    7 USC § 192 pertinently provides:

It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to: (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect.

109.    Under 7 U.S.C. § 213: Prevention of unfair, discriminatory, or deceptive practices,

(a) It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with determining whether persons should be authorized to operate at the stockyards, or with the receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling of livestock.

110.    Defendants used their power over Plaintiff Sanders because he is black.  The performance of Sanders as a grower for Defendant Koch was consistently average or above average.  Thus, neither Sanders's performance nor the operation of his farm was grounds for Koch's refusal to place chickens on Sanders's farm, though Koch has repeatedly slandered and defamed Sanders in its attempt to justify its discriminatory and prejudicial conduct.

28

111.    The grounds given to Plaintiff Sanders by Defendant Koch for its refusal to deliver flocks to his farms in accordance with the terms of the Broiler Growing Agreement was a pretext for the actual reason, which was to discriminate against Sanders because he is black, and to squeeze him financially, put him out of the poultry business and stop and hinder him due to his race.

112.    The conduct described herein constitutes unjust discriminatory and deceptive practices, as found after two thorough investigations by the USDA, engaged in by the Koch Defendants and their agents and employees, including:  a) the Service Manager Todd Williams, b) the North Broiler Manager Joe Bergin, c) the Live Production Manager Ronnie Joe Keyes, and; d) the Live Production Manager Shirley Freeny and Joey Freeny, who oversees trucks and catchers, who are both related to the purchaser of the farm, Matthew Freeny, all in violation of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 192(a) and 7 U.S.C. § 213.

113.    The conduct described herein resulted in Plaintiff Sanders being subjected to undue and unreasonable prejudice, and disadvantage; all in violation of the PSA, 7 U.S.C. § 192(b).

114.    Defendant Koch's breach of its Poultry Growing Arrangement with Plaintiff Sanders was without economic justification and was in violation of the PSA, 7 U.S.C. § 192(b).

115.    Defendant Koch's demands generally set forth in the 23-Upgrades letter dated November 4, 2015,  and within the impossibly short time frame that was given to Plaintiff Sanders, violated 7 U.S.C. § 192(a) and (b), including as construed under 9 C.F.R. § 201.216, and other relevant sections of the PSA.

116.    As to upgrades required by Defendant Koch prior to the 23-Upgrades letter dated November 4, 2015, Defendant Koch' threatened and actual termination of the Plaintiff Sanders's Broiler Growing Agreement violated 7 U.S.C. § 192(a) and (b), including as construed pursuant

29

to 9 C.F.R. § 201.216, and other relevant sections of the PSA.

117.    Plaintiff Sanders was an established black farmer with a good track record over many years.  Defendant Koch's singling Sanders out (giving white farmers nine months to complete two minimum requirements versus about a month for Sanders) and demanding that Sanders instantaneously conduct twenty-three expensive upgrades that exceeded Class A specifications, when he ably met Class B specifications, forcing him to comply with brand new building requirements on his existing farm, at a cost of at least $318,000, on top of other expensive upgrades, knowing he would have to borrow yet more money and take on even more debt, to keep getting birds, and other practices described herein, violated 7 U.S.C. § 192(b) and other relevant sections of the PSA.  Defendant Koch made and gave an undue and unreasonable prejudice and disadvantage to Sanders because he is black.

118.    Defendant Koch's cutting off of the supply of birds to Plaintiff Sanders' farms, thereby cutting off his livelihood, without proper notice and under unsubstantiated, unlawful, and menacing means, including an unrealistic list of 23 expensive upgrades that no other farmer, all white, had to comply with, written to Sanders as a *To Whom It May Concern*, rather than to *Mr. Sanders*, and with no notice, by Koch's own admission on September 21, 2017, violated 7 U.S.C. §§ 192(b) and 213, and other relevant sections of the PSA.  Defendant Koch made or gave an undue or unreasonable prejudice or disadvantage to Sanders.

119.    Since Plaintiff Sanders is black and was the only farmer to receive Defendant Koch's 23-Upgrades letter, mandating that Sanders upgrade his houses at a cost of over $318,000, money they knew he did not have.  Koch's conduct ensured that PriorityOne would not loan Sanders the additional money, Sanders would default, and that a relative of Koch would later

purchase the Property at a discounted price, and other practices described herein, violated 7 U.S.C. § 192(a) and (b), 7 U.S.C. § 213, and other relevant sections of the PSA.  Koch engaged in and used unjustly discriminatory practices and devices.

120.    The 23-Upgrades letter, which remains uncorrected, forcing expensive upgrades on Plaintiff Sanders that were to be performed at lightning speed, that were neither mandatory nor necessary, singling him out as the only farmer to receive such demands from Defendant Koch, violated 7 U.S.C. § 192(a) as an unfair and deceptive practice or device, including as construed under 9 C.F.R. § 201.53, and other relevant sections of the PSA.

121.    Defendant Koch's threatened and actual wrongful termination of Plaintiff Sanders' Broiler Growing Agreement and other conduct and practices, taken together or viewed individually, violated 7 U.S.C. § 192(a) and (b), 7 U.S.C. § 213, and other sections of the PSA.

122.    Defendant Koch violated 7 U.S.C. § 192(a), and other relevant sections of the PSA, by engaging in unfair and deceptive practices or devices, including without limitation:

   a.    Failing to provide legitimate reasons for the termination of Plaintiff Sanders's Broiler Growing Agreement ("BGA"), or reasons consistent with the termination provision thereof, as required by 9 C.F.R. § 201.100.
   b.    Violating the terms of the BGA, including the termination provision, and failing to satisfy 9 C.F.R. § 201.100.
   c.    Failing to provide notice to Sanders of an alleged breach of his BGA as was required by or in compliance with 9 C.F.R. § 201.217.
   d.    Refusing to provide reasonable assurances of reinstatements of supplies of birds.
   e.    Providing misleading information to Sanders regarding the 23-Upgrade letter, forcing upgrades exceeding Class A specifications when none were required and forcing new building requirements on an existing farm.
   f.    Violating 9 C.F.R. § 201.200(a) by failing to provide timely written notice of upgrade requirements and of lawful notice that it was terminating the BGA, which was the date it provided Sanders with the written alleged Class A specifications and new construction poultry house specifications for an existing farm, or at any time or subsequent point and beyond.

123.    While Plaintiff Sanders contends that the likelihood of competitive injury is not a

31

required element for stating a claim for all of the practices or devices described herein, the foregoing violations of 7 U.S.C. § 192(a) and (b) and other relevant sections of the PSA, all have the likely effect of reducing the poultry output that would have otherwise been created by the utilization of black farmers for poultry growing, which over time will impact the price paid by end-users, and created a likelihood of competitive injury within the poultry markets.  In addition, a proven showing of competitive injury has already been demonstrated against black farmers.  The systematic elimination of black farmers altogether has caused competitive injury on the poultry market which Sanders was engaged in, and on the poultry market in general, by reducing the poultry supply in the geography served by Defendant Koch in Mississippi.

124.    Plaintiff Sanders is entitled to damages arising out of Defendant Koch's breaches of 7 U.S.C. § 192(a) and (b), and 7 U.S.C. § 213, including without limitation, loss of anticipated profits in excess of $75,000.00, costs of the completed upgrades, diminution in property value, loss of equity, loss of property, prejudgment interest, attorneys' fees and costs of litigation, and other compensatory and special damages.

## COUNT IV
## FRAUD

125.    Plaintiffs re-allege and incorporate all Paragraphs contained in this Complaint.

126.    Defendant Koch represented to Plaintiff Sanders that if he grew good birds, he would continue to receive placements of baby chicks from Koch.  This was not true.

127.    Defendant Koch is one of the largest poultry dealers in the United States, slaughtering and shipping for consumption millions of pounds of chicken each week.

128.    Defendant Koch operates as an "integrator."  It controlled every aspect of Plaintiff Sanders's raising of chickens, slaughtering them, and selling their meat.  Sanders

was required to follow Koch's rules and regulations to participate in this system.

129.    Defendant Koch's various chicken meat products are born in Koch hatcheries, from eggs laid by Koch hens, and remain Koch property throughout their entire lives.  The chickens are grown on feed formulated and provided by Koch, in conditions regulated by Koch, and treated by veterinarians hired by Koch according to Koch's standards and rules.

130.    Chickens are slaughtered on the date Defendant Koch selects, in Koch plants, where Koch employees evaluate the birds to determine if they are fit for human consumption.

131.    In this system, Plaintiff Sanders bore the risk and not Defendant Koch.  As a black man, Sanders was particularly vulnerable and responsible for building and maintaining the farms on which the chickens were cared for, relying on Koch's representations regarding its commitment to him as a contractor and his future earnings, to take out massive loans (typically guaranteed by United States taxpayers), for which he was personally responsible, and for which the ultimate winner was a relative of Koch employees.

132.    Plaintiff Sanders was paid based on a "tournament system," in which growers whose chickens were slaughtered within a given week competed with one another.  The top producing growers, as solely hatched, weighed and determined by Koch, were paid a premium and the lower ranked growers were subjected to offsetting discounts or deductions.  This ensures that Koch's costs are consistent and gives Koch considerable latitude to financially reward favored same-race growers and to penalize growers who were members of races other than Koch employees.

133.    Defendant Koch leveraged this system with Plaintiff Sanders, and its position as the sole food integrator with whom Sanders could do business with, to manipulate and

defraud him and dodge its contractual obligations because he was black. Koch induced Sanders to join its operation through material representations regarding compensation and Koch's purported institutional commitment to ensure that he would receive a reasonable return on his investment. But, in fact, as Koch knew, it could easily set the stage to harm Sanders due to his race. It operated its business to advantage only itself and its white growers, to Sanders's detriment, undermining Sanders's ability to earn and pay off his ever-increasing debt, which was paid directly by Koch via the Assignment of Money to PriorityOne.

134. Defendant Koch unilaterally stopped delivering flocks to Plaintiff Sanders, creating a subterfuge and giving pretextual reasons, cutting off his ability to earn a living and to pay off the enormous debt that Koch had forced upon him though PriorityOne.

135. When Defendant Koch stopped bringing Plaintiff Sanders's flocks of chickens, abruptly and without lawful notice, putting him out of business, Koch stated that it would not place chickens on Sanders's farms until he complied with twenty-three expensive upgrades that included non-essential upgrades, and upgrades irrelevant to his class of birds or to his established houses, as opposed to brand new houses.

136. Similarly situated white growers were not required to make these same twenty-three upgrades that Defendant Koch was requiring from Plaintiff Sanders in order to receive chickens from Koch.

137. Even when the USDA attempted to negotiate with Defendant Koch to get chickens again delivered to Sanders's farm if Sanders's complied with ten alleged minimum requirements, Koch refused to provide any assurances, therein ratifying its wrongful conduct deep into 2017. Koch took this position despite knowing that Sanders was obligated to

PriorityOne to pay the debts created by his reliance on Koch's promises that if Sanders met Koch's ever-increasing demands, Koch would adhere to the Broiler Growing Agreement and live up to its end of the bargain.

138.   On September 21, 2017, the USDA stated unequivocally in an email to Defendant Koch through its attorney that:  "[your] position stops short of what the Packers and Stockyards Program has requested:  a commitment by Koch to place poultry on the Sanders' farm if a house meets the minimum requirements required by Koch."

139.   In this same email, the USDA reasoned that:

Because Mr. Sanders and PriorityOne are considering spending or loaning money to get the houses back in the condition needed for the placement of birds, Koch's actual commitment to place poultry on the farm is necessary.  Otherwise, Mr. Sanders is faced with the possibility of incurring additional debt with no commitment by Koch to place poultry, and PriorityOne Bank is faced with the possibility of loaning more money without any commitment by Koch to place poultry on the farms.

140.   In this email dated September 21, 2017, the USDA points out that Defendant Koch had already stated that:  "Koch has never, to our knowledge, given notice to Mr. Sanders that his contracts on the Cory Sanders Farm or the Carlton Sanders Farm have been terminated or will not be renewed, so both contracts remain in place."

141.   While the USDA stressed in its email dated September 21, 2017 that "Time remains of the essence for both Mr. Sanders and PriorityOne," Defendant Koch did not meaningfully respond, and Sanders was foreseeably forced into foreclosure and bankruptcy. This bankruptcy in turn made it almost impossible for Sanders to find an attorney to file this case, as most were skittish to get involved because of the bankruptcy.

142.   Defendant Koch wrongfully sought to compel Plaintiff Sanders to assume more debt by conducting twenty-three "updates" even though Sanders was efficiently producing for

Koch.  Koch violated the Packers and Stockyards Act ("PSA"), breached its Poultry Growing Agreement, engaged in racially discriminatory conduct, and committed fraud.

143.    Defendant Koch made specific promises to Plaintiff Sanders to induce him into entering contractual obligations with Koch, borrowing money from PriorityOne, and assigning the money Sanders earned from Koch back to PriorityOne.  Sanders specifically relied on these promises, which turned out to be false and which Defendants knew were false at the time the promises were made.

144.    Defendants made material representations to Plaintiff Sanders, which they knew were false, but were unknown to be false by Sanders who relied on the material representations based on his history with Defendants and their subsequent conduct, which ratified their fraudulent conduct.  Sanders had the right to rely on the material representations, which proximately caused him injury, including the loss of his home, farm, family, and livelihood, and put his health and life in jeopardy.

145.    Defendant Koch's representations that he would receive chickens and continue to receive chickens were the primary inducements for Plaintiff Sanders to enter into the Poultry Growing Agreement with Defendant Koch, to initially and repeatedly borrow money from PriorityOne, as well as to expend his own funds on his chicken houses to meet Koch's shifting demands.

146.    Defendants conduct, independently and collectively, as alleged herein, is fraud.

147.    Defendant Koch knew that its representations to Plaintiff Sanders as alleged in detail herein, were false and were intended to induce Sanders to put him out of business, force him to default on his loans, and eliminate him as a farmer for Koch because of his race.  Koch likewise

knew that a relative of its employees would financially benefit from the sale of Sanders's farm when he purchased the Property for $21,000 less than a *bonafide* buyer with a pre-approved loan was prepared to pay for it, and for $171,000 less than what PriorityOne insisted it was worth.

148.   Plaintiff Sanders reasonably relied on Defendant Koch's representations concerning the longevity of the relationship and the promises from Koch to keep supplying Plaintiff Sanders with birds to his detriment.  Sanders did not know that the representations were false until the events with Koch unfolded over time.  These continuing violations included the following when Koch:  a) presented Sanders with an unlawful 23-Upgrade list on November 4, 2015, that no white farmer received; b) subsequently and unlawfully and without proper notice stopped supplying Sanders with chickens; c) entered into negotiations with the USDA to resume supplying chickens, only to renege on its obligations under the law; d)  reneged on its promises to Sanders that if he did twenty-two upgrades he would continue getting birds; e) refused to put twenty-three upgrades in writing and when it did, untimely forced unreasonable, unsupported and expensive demands on Sanders under an impossibly steep timeline; f) breached its commitments under the Poultry Growing Agreement that it had with Sanders; g) manipulated the sale of Sanders's farm to a relative of Koch employees, and; h) disregarded and dismissed its obligations under all applicable state and federal laws.

149.   As a direct and proximate result of Defendant Koch's violations, Plaintiff Sanders's suffered and incurred substantial damages.  These damages include lost business opportunities, litigation expenses, including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory and other damages.

150.   As a proximate result of the fraudulent acts of Defendant Koch, Plaintiff Sanders

has suffered damages in excess of $75,000.00.

### COUNT V
### BREACH OF CONTRACT

151.    Plaintiffs re-allege and incorporate all the Paragraphs contained in this Complaint.

152.    Defendant Koch deliberately and maliciously refused to honor the commitments it made in the Broiler Growing Agreements, also referred to herein as Broiler Production Agreements, that it entered with Plaintiff Sanders, including the one signed on March 8, 2015, as set forth in Counts I-V, and as otherwise outlined in detail herein.

153.    As a direct and proximate result of Defendant Koch's breaches, which included the loss of Plaintiff Sanders's farm and home, Sanders suffered and incurred substantial damages. These damages include lost income, lost business opportunities, litigation expenses, including attorney fees, loss of reputation, humiliation, embarrassment, displacement, inconvenience, mental and emotional anguish, health repercussions, bankruptcy costs and repercussions, and other compensatory damages, in an amount to be determined by a jury and the Court.

154.    As a proximate result of the breaches by Defendant Koch, Plaintiff Sanders has suffered damages in excess of $75,000.00.

### COUNT VI
### NEGLIGENT, WILLFUL AND RECKLESS MISREPRESENTATIONS

155.    Plaintiffs re-allege and incorporate all the Paragraphs contained in this Complaint.

156.    Defendant Koch represented to Plaintiff Sanders that it would not place birds on Sanders's farm if did not perform unlawful, expensive, impossible, and unrealistic upgrades and demands that were designed as a pretext and subterfuge to put Sanders out of business because of his race.  Koch engaged in this conduct unlawfully and improperly under all applicable federal and

state laws.

157.   Defendant Koch's conduct as alleged herein was negligent, willful and reckless, and was material and intended to harm Plaintiff Sanders because of his race.

158.   As a proximate result of the misrepresentations by Defendant Koch, Plaintiff Sanders has suffered damages in excess of $75,000.00.

## CONCLUSION

159.   Plaintiffs request that this Honorable Court accept this Complaint for filing, and after a trial by jury, render a Judgment in favor of Plaintiffs against Defendants, as follows:

a.   an order for the unredacted release of the USDA discrimination investigations.

b.   a finding that Defendants illegally discriminated against Plaintiff Sanders due to his race and enter the appropriate declaratory judgment for the same.

c.   a Judgment for compensatory and general damages.

d.   an assessment of punitive damages, where appropriate under the law, to punish and deter Defendants from this type of conduct in the future, to be determined by the jury.

e.   an award of compensatory and punitive damages, costs and expenses to Plaintiffs for having to bringing this action, as allowed under the law.

f.   a grant of all appropriate equitable relief, including injunctive relief, against Defendants, and an award of pre-judgment and post-judgment interest appropriate under the law.

g.   a judgment for all attorney fees and expenses arising out of the Bankruptcy proceedings made necessary by Defendants' wrongful conduct.

h.   an award of Plaintiffs' attorneys' fees and costs arising from the present litigation.

WHEREFORE, Plaintiffs, Carlton Sanders and Stephen H. Smith, request that that a

judgment be entered against Defendants, Koch Foods Incorporated, Koch Farms of Mississippi, LLC, and Koch Foods of Mississippi, LLC, for compensatory damages, punitive damages, reimbursements, and all other relief, including consequential damages, expenses, attorneys' fees and costs, and all other amounts due under state and federal statutes, and for all other fair and just relief to which Plaintiffs entitled to under the facts of the case and applicable law.

### JURY TRIAL DEMANDED

160.    Plaintiffs request a jury trial on all questions of fact raised by their Complaint.

Respectfully submitted on this the 5th day of November, 2019.

Plaintiffs Represented:

BY:    /s/*Elizabeth A. Citrin*
        ELIZABETH A. CITRIN (101368)
        Attorney for Plaintiffs

Appointed as Special Counsel
by the Honorable Neil P. Olack
Elizabeth A. Citrin, Esq.
Elizabeth A. Citrin, P.C.
28311 N. Main Street, Suite B-103
Daphne, AL 36526
Phone:  251-626-8808
Fax:  251-626-8860
Email:  elizabeth@elizabethcitrin.com

BY:    */s/ Mary Beth Mantiply*
        Mary Beth Mantiply (MAN017)
        Attorney for Plaintiffs

Mary Beth Mantiply, Esq.
P.O. Box 862
Montrose, AL 36559
Phone: 251-625-4040
Email:  mbmantiplylaw@gmail.com