**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CARLTON SANDERS and
STEPHEN H. SMITH as Chapter 7 Bankruptcy
Trustee for CARLTON SANDERS**                                          **PLAINTIFFS**

**VS**                                          **CIVIL ACTION NO. 3:19-CV-721-DPJ-FKB**

**KOCH FOODS, INCORPORATED;
KOCH FARMS OF MISSISSIPPI, LLC, and
KOCH FOODS OF MISSISSIPPI, LLC**                                          **DEFENDANTS**

---

**KOCH FOODS, INC.; KOCH FARMS OF MISSISSIPPI, LLC; AND KOCH FOODS OF
MISSISSIPPI, LLC'S MEMORANDUM OF AUTHORITIES IN SUPPORT OF THEIR
MOTION TO DISMISS**

---

Scott W. Pedigo (MS Bar No. 10735)
Amy L. Champagne (MS Bar No. 102477)
R. Christopher White (MS Bar No. 105509)
BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, P.C.
100 Vision Drive, Suite 400 (39211)
P.O. Box 14167
Jackson, Mississippi 39236
Telephone:  (601) 351-2400
Facsimile:  (601) 351-2424
spedigo@bakerdonelson.com
achampagne@bakerdonelson.com
rcwhite@bakerdonelson.com

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .......................................................................................1

ARGUMENT ...........................................................................................................4

    I.      Motion to Dismiss Standard.......................................................................4

    II.     Sanders's PSA, Breach of Contract, Fraud, and Misrepresentation Claims Are Each Time-Barred. ...................................................................................5

          A.     Sanders's Packers and Stockyards Act Claims Were Filed Beyond the Limitations Period and Must Be Dismissed.................................................5

                1.     Mississippi's Antirust Act provides the most analogous state cause of action, so its three-year limitations period should govern Sanders's PSA claims. .....................................................................6

                2.     Application of Mississippi's three-year limitations period will not frustrate the policies underlying the PSA or impede its implementation. ..........................................................................7

                3.     Sanders's PSA claim was untimely as a matter of law. ...................8

          B.     Sanders Failed to Bring His Breach of Contract Claim Within Three Years of the Alleged Breach. ................................................................................8

          C.     Sanders's Fraud and Misrepresentation Claims Are Untimely...................9

    III.    Even if Sanders's Claims Were Not Barred by Limitations, Counts II, III, IV and VI Fail for the Following, Independent Reasons. ...................................................10

          A.     Sanders's PSA Claims (Counts II and III) Must be Dismissed Because §213 is Inapplicable to Live Poultry Dealers and Because Sanders Has Not Properly Pled an Injury to Competition in the Market. ............................10

                1.     Section 213 does not apply to live poultry dealers. .......................10

                2.     Sanders has not pleaded and cannot plead likelihood of injury to competition sufficient to sustain his PSA claims..........................10

                       a.     The PSA only prohibits conduct that injures, or that is likely to injure, competition..............................................10

                       b.     The source of the PSA's terms confirm the PSA  was not meant to prohibit all discrimination..................................12

c.      Sanders has not alleged and cannot allege competitive injury or a likelihood of competitive injury.......................13

B.      Even if Sanders Had Timely Filed and Properly Pleaded Competitive Injury, Count II Fails Because He Has Pleaded No Facts to Establish a Regulatory Violation..................................................................................17

1.      9 C.F.R. § 201.200 has no application in this case. .......................18

2.      9 U.S.C. § 201.53 does not address the type of alleged misrepresentations made by Koch. ................................................18

3.      Sections 201.216 and 201.217 do not prohibit conduct, but instead merely provide criteria the Secretary *may* consider in determining whether the PSA has been violated................................................19

a.      Section 201.216................................................................19

b.      Section 201.217................................................................20

4.      Sanders's Agreements complied with § 201.100...........................21

C.      Sanders's Fraud Claim (Count IV) Should Be Dismissed.........................22

D.      Sanders Has Not Alleged, and Cannot Allege, the Necessary Elements of a Misrepresentation Claim (Count VI). ........................................................24

CONCLUSION......................................................................................................................25

Koch Foods, Inc.; Koch Farms of Mississippi, LLC ("Koch Farms"); and Koch Foods of

Mississippi, LLC ("Koch Foods") (collectively "Koch")[1] move this Court, under Federal Rule of

Civil Procedure 12(b)(6), to dismiss Counts II through VI of Plaintiffs', Carlton Sanders and

Stephen H. Smith as Chapter 7 Bankruptcy Trustee for Carlton Sanders (collectively "Sanders"),

Amended Complaint for failure to state claims upon which relief can be granted.

## INTRODUCTION

This case arises from a single poultry farmer's admitted refusal to meet his contractual

obligation to ensure his chicken houses met the minimum specifications established by Koch.

Sanders disagrees. He alleges Koch discriminated against him based on his race.  But even

assuming that all of Sanders's allegations are true, he has failed to state viable claims for

violations of the Packers and Stockyards Act ("PSA") (or any regulations implemented pursuant

to the Act), fraud, breach of contract, or misrepresentation.  Each of these claims should be

dismissed because Sanders failed to timely file them.  In addition, Sanders's PSA, fraud, and

misrepresentation claims are ripe for dismissal because Sanders has not alleged any set of facts

entitling him to relief for these claims as a matter of law. For these reasons, Counts II through VI

should be dismissed with prejudice.

## STATEMENT OF FACTS

Koch is a vertically integrated poultry processor, who contracts with over one hundred

independent poultry farmers to grow broiler chickens to supply its chicken processing facilities.

[Amended Complaint, ("Compl."), ¶ 13-14, 22]  Plaintiff Sanders has owned and operated two

poultry farms in Mississippi, the Carlton Sanders Farm and the Cory Sanders Farm, since 1992.

[Compl. ¶ 29]  Sanders first began growing chickens for Koch in 2001 under two, separate

---

[1] For the sake of simplicity, Defendants will collectively refer to themselves as "Koch" throughout this brief. In so doing, Koch Foods, Inc. and Koch Foods do not intend to waive any of their individual defenses, including that they are improper defendants, and they expressly reserve the right to raise those defenses at a later date.

Broiler Growing Agreements (the "Carlton Agreement") (the "Cory Agreement") (collectively, the "Agreements").  [Compl. ¶¶ 11, 29]; *see also* Carlton Sanders Farm Broiler Growing Agreement, attached as Exhibit A; Cory Sanders Farm Broiler Growing Agreement, attached as Exhibit B.[2]

Under Koch's contracts with Sanders, Koch supplied Sanders with flocks of chicks and feed in exchange for Sanders's agreement to house and raise the chicks according to Koch's requirements.  Exhibits A and B, at §§ 1A-B, 2.  Koch paid Sanders, like all of its other growers, under a ranking system, which considers the live weight of the chickens and the cost of raising them. [Compl. ¶¶ 32, 65, 132]  Koch pays different rates of pay depending on the type of chicken housing used by the grower.  [Compl. ¶¶ 38, 65, 132]  "Class B" housing (which has lower specifications) corresponds to a lower pay rate than "Class A" housing (which has higher specifications aimed at improving efficiency). [Compl. ¶¶ 38, 44, 65, 132]  Sanders raised birds in Class B housing on both of his farms.  [Compl. ¶¶ 38, 44]

In February 2015, Koch updated its minimum poultry house standards for ventilation. [Compl. ¶¶ 34, 65]  Specifically, Koch set new minimum standards for wind speed (cools birds in warm weather) and static pressure (warms birds in cold weather).  [Compl. ¶ 34]; *see also* February 2, 2015 Grower Letter, attached to Defendants' Motion as Exhibit C.  On February 2, 2015, Koch notified all of its growers, including Sanders, that the minimum static pressure required for the upcoming winter had to be met by November 1, 2015. [Compl. ¶¶ 34, 65]; Exhibit C.  The minimum wind speed was to be met by May 1, 2016. Exhibit C.

---

[2] Courts may consider documents attached to a motion to dismiss when the documents are referred to in the pleadings and are central to a plaintiff's claims. *See, e.g.*, *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).

At that time, Sanders's seven chicken houses met the new minimum wind speed, but not the minimum static pressure. [Compl. ¶¶ 35, 44]  According to Sanders, he expected the improvements needed to comply to cost only $1000 per house.  [Compl. ¶¶ 35, 44, 100]  But Sanders makes no allegation that he ever brought his houses into compliance.

Some eight months later, on October 10, 2015, Sanders spoke to Koch employees about the condition of his houses.  [Compl. ¶ 36]  Sanders expressed interest in upgrading his aging houses to the higher paying Class A specification (which he contends Koch was requiring of him, but that Koch denies) and requested that Koch provide him with a written list of the improvements that would be required to do so.[3] [Compl. ¶¶ 36, 65]

On November 4, 2015, Koch complied with Sanders's request, providing him a generically addressed letter he could use to seek financing. That letter outlined 23 items required of new Class A houses. [Compl. ¶¶ 38, 42, 65]  Koch consistently explained that there was no requirement that Sanders move to Class A; the only improvements required of Sanders's housing were those needed to increase their static pressure. [Compl. ¶¶ 54, 58, 65]

On November 20, 2015, Koch caught the flock placed on October 10. [Compl. ¶ 47] Because Sanders's houses did not meet the new, minimum static pressure requirement, no new flocks were placed with him. [Compl. ¶¶ 35, 44, 47-48, 58, 65]  Rather than make the relatively inexpensive repairs needed to secure flocks on his farms, Sanders filed a racial discrimination complaint with the USDA against Koch in December 2015. [Compl. ¶ 49]

Sanders cites the requested November 4, 2015 letter as the basis for his discrimination claim.  [Compl. ¶¶ 42, 103]  Even if Sanders had misunderstood that the 23 items in the letter were being required of him, which they were not, his misunderstanding was dispelled when

---

[3] Sanders alleges that his bank also later requested similar documentation.  [Compl. ¶¶ 37, 65]

Koch explained the purpose of the letter and that the 23 items were not required during the USDA's subsequent investigation. [Compl. ¶¶ 43, 54, 65] And yet, Sanders—who had known that his static pressure was non-compliant since February 2015—made no effort to achieve the minimum in any of his houses. [Compl. ¶ 96]  Instead, he filed for bankruptcy. [Compl. ¶76]

On October 8, 2019, nearly four years after Sanders alleges he was told he had to make the discriminatory "23 upgrades," he filed suit, claiming that Koch drove him—Koch's own grower—out of business for racially motivated reasons.  [Dkt.1]  In his Amended Complaint, Sanders brings claims under § 1981 of the Civil Rights Act and §§ 192 and 213 of the Packers and Stockyards Act ("PSA") and various regulations promulgated under the Act in addition to his claims of fraud, misrepresentation, and breach of contract.  Sanders blames the loss of his home and farm, his divorce, and even a stroke and heart attack on Koch, [Compl. ¶¶ 49, 76], and seeks compensatory and punitive damages and attorneys' fees. But despite a litany of vague and inflammatory allegations and the sheer length of his Amended Complaint, Sanders has not stated a claim as a matter of law with respect to Counts II through VI for the reasons set forth below:

## ARGUMENT

### I.    Motion to Dismiss Standard

The Federal Rules of Civil Procedure require that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss pursuant to Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Brune v. Takeda Pharma. U.S.A., Inc.*, No. 1:18-cv-298-LG-RHW, 2019 WL 3323511, at *4

4

(S.D. Miss. July 24, 2019) (quoting *Iqbal*, 556 U.S. at 678).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.*  "[T]he complaint must allege more than labels and conclusions, a formulaic recitation of the elements of a cause of action will not do, and factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* (quoting *Jabaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009)).  To satisfy that burden, any legal conclusion "must be supported by factual allegations" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (quoting *Iqbal*, 556 U.S. at 664, 678).

## II.     Sanders's PSA, Breach of Contract, Fraud, and Misrepresentation Claims Are Each Time-Barred.

Sanders's Packers and Stockyards Act ("PSA"), breach of contract, fraud, and negligent misrepresentation claims are all governed by Mississippi's three-year statute of limitations. Sanders was aware of the facts giving rise to his claims no later than December 2015 when he filed his race discrimination claim with the USDA. Thus, these claims—claims he failed to raise until October 8, 2019—are each time-barred and should be dismissed as a matter of law.

### A.     Sanders's Packers and Stockyards Act Claims Were Filed Beyond the Limitations Period and Must Be Dismissed.

The PSA does not specify a statute of limitations for private actions brought under the Act.[4]  *Prostar v. Massachi*, 239 F.3d 669, 672 (5th Cir. 2001).  The Court therefore should borrow the three-year statute of limitations found in Mississippi's Antitrust Act and dismiss Sanders's untimely PSA claim. *Id*. ("The Supreme Court has affirmed that [when Congress fails to provide any limitations period for a cause of action it has created,] state law is the 'lender of

---

[4] The default federal statute of limitations does not apply because the PSA's private cause of action predated its enactment.  28 U.S.C. § 1658(a).

5

first resort,' and [] courts generally are to adopt the closest state-law analogue." *Id.* (quoting

*North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995)).

### 1.     Mississippi's Antirust Act provides the most analogous state cause of action, so its three-year limitations period should govern Sanders's PSA claims.

When faced with a federal cause of action having no express limitations period, courts

must first "'characterize the essence' of the statute in question to determine which state cause of

action is most analogous." *Id.* (quoting *Staudt v. Glastron, Inc.*, 92 F.3d 312, 314 (5th Cir.

1996)).  As the Fifth Circuit has recognized, the "purpose of the Packers and Stockyards Act of

1921 is to protect competition." *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 357 (5th Cir.

2009).  The PSA was enacted originally in response to the monopolistic control maintained by

the "Big Five" meatpackers, despite adoption of the Sherman Act and numerous Justice

Department actions.  *Id.* at 360.  "The legislative debate surrounding the PSA supports the

conclusion that it was designed to combat restraints on trade, with everyone from the Secretary

of Agriculture to members of Congress testifying to the needs of this statute to promote healthy

competition."  *Id.* at 361 (citing legislative history).

The Mississippi Antitrust Act, MISS. CODE ANN. § 75-21-1, *et seq*., is based on similar

antitrust principles. Indeed, the "legislative intent of the [A]ct is clearly to 'suppress' all trust and

monopolies," including those existing in the poultry business.  *Hood ex rel. State v. BASF Corp.*,

No. 56863, 2006 WL 308378, at *4 (Miss. Ch. Ct. Jan. 17, 2006).  The Act "shall be liberally

construed in all courts to the end that trusts and combines may be suppressed, and the benefits

arising from competition in business preserved to the people of this state."  *Id.* (quoting MISS.

CODE ANN. § 75-21-39). The Act, like the PSA, also provides for private causes of action to

recover damages caused by anti-competitive business practices. MISS. CODE ANN. § 75-21-9.  It

is therefore appropriate in this case to borrow the three-year limitations period applicable to

Mississippi Antitrust Act claims. *See Carder v. BASF Corp.*, 919 So. 2d 258, 261 (Miss. Ct.

App. 2005) (Mississippi Antitrust Act governed by a three-year statute of limitations).

> **2.    Application of Mississippi's three-year limitations period will not frustrate the policies underlying the PSA or impede its implementation.**

Once the most analogous state law is identified, "courts must determine whether

application of the [pertinent] state limitations period would frustrate the policies underlying

federal law or impede its practical implementation." *Prostar*, 239 F.3d at 672. (quoting *North*

*Star*, 515 U.S. at 35). "If a state limitations period would not generate such adverse

consequences, then the state limitations period applies and [the Court's] inquiry is concluded."

*Id.* (quoting *North Star*, 515 U.S. at 37).

The PSA's purpose of protecting competition will not be frustrated by application of

Mississippi's three-year limitations period because anti-competitive conduct typically results in

easily identifiable injury almost immediately. Sanders's allegations exemplify this. Moreover,

eliminating anti-competitive conduct and awarding damages to harmed competitors obviously

has the best chance of sustaining or reinvigorating competition when accomplished soon after the

unlawful conduct is discovered and before potential competitors are driven out of the market.

Further, application of state limitations periods to PSA claims will not impede its

implementation because grower operations are inherently local and therefore disputes are not of

the type that involve plaintiffs operating in multiple states where uniformity of limitations

periods may be necessary. *See, e.g., Prostar*, 239 F.3d at 677 (finding impediment in requiring

plaintiff cable companies engaging in multistate activities to be "constantly required to 'make

fifty separate decisions' in their efforts to investigate and pursue cable piracy" under the Federal

Communications Act).  In contrast to the plaintiff in *Prostar*, who owned the broadcast rights for

a boxing match in multiple states, growers seeking to bring claims under the PSA are not faced

with having to comply with statute of limitations in multiple jurisdictions since livestock, swine, and poultry operations are localized businesses.

### 3.   Sanders's PSA claim was untimely as a matter of law.

Under the three-year statute of limitations applicable to the Mississippi Antitrust Act, the limitations period accrues when "the plaintiff has discovered, or by reasonable diligence should have discovered, the injury."  Miss. Code Ann. § 15-1-49.  Sanders's PSA claim is premised on Defendants' alleged refusal to place birds on his farms until he performed the allegedly required "23 upgrades."  [Compl. ¶¶ 115-122]  Sanders, therefore, should have known that he had suffered injury on October 10, 2015—the date that these upgrades were allegedly demanded, and he was refused new flocks.  [Compl. ¶ 36]  At the very latest, Sanders knew of his alleged injury by December 2015 when he filed his race discrimination complaint with the USDA.  [Compl. ¶ 49]  Thus, the three-year statute of limitations ran on Sanders's PSA claims no later than December 2018.  His PSA claims, filed on October 8, 2019, should be dismissed.

### B.   Sanders Failed to Bring His Breach of Contract Claim Within Three Years of the Alleged Breach.

In Mississippi, breach of contract claims are subject to a three-year statute of limitations. *Wallace v. Greenville Pub. Sch. Dist.*, 142 So. 3d 1104, 1106 (Miss. Ct. App. 2014).  A cause of action for breach of contract "accrues at the time of the breach, regardless of the time when the damages from the breach occurred."  *Id.* at 1107 (quoting *Johnson v. Crisler*, 125 So. 724, 724-25 (Miss. 1930)); *see also Black v. Ansah*, 876 So. 2d 395, 399 (Miss. Ct. App. 2003) ("A cause of action for that breach occurs when the notice was received, 'regardless of the time when the damages from the breach occurred.'" (quoting *Johnson*, 125 So. at 724)).

No set of facts in the Amended Complaint make Sanders's October 8, 2019 filing timely. As with his PSA claim, the limitations period for Sanders's breach of contract claim expired no

later than December 2018—three years after Sanders knew all of the alleged, wrongful conduct that he described to the USDA in December 2015. This claim should be dismissed as untimely.

### C. Sanders's Fraud and Misrepresentation Claims Are Untimely.

Both fraud and intentional misrepresentation claims are subject to three-year limitations periods under Mississippi law. *Sanderson Farms, Inc. v. Ballard*, 917 So. 2d 783, 789 (Miss. 2005); *Carter v. Citigroup, Inc.*, 938 So. 2d 809, 817 (Miss. 2006) ("This [c]ourt has held that there is a three-year statute of limitations for claims of . . . misrepresentation . . . ."); *see also Gray v. Upchurch*, No. 5:05cv210, 2006 WL 3694604, *5 (S.D. Miss. Dec. 13, 2006) (citing *Ballard* for proposition that intentional misrepresentation claim subject to three-year limitations period). "A fraud claim accrues upon the completion of the sale induced by such false representations, or upon the consummation of the fraud . . . ." *Ballard*, 917 So. 2d at 789.

Both Sanders's fraud and misrepresentation claims are barred by limitations as a matter of law. Sanders's fraud claim is based on allegations that Koch promised Sanders that he would continue to receive flocks "if he grew good birds" and "representations regarding compensation and Koch's purported institutional commitment to ensure that he would receive a reasonable return on his investment." [Compl. ¶¶ 125, 133] His misrepresentation claim is premised on Koch's alleged insistence that he perform "23 upgrades" to secure additional flocks. [Compl. ¶¶ 155-58] Like his PSA and breach of contract claims, both of these claims also accrued no later than October 10, 2015 when Koch allegedly demanded the upgrades and refused to place additional birds with Sanders or, at the very latest, in December 2015 when Sanders complained to the USDA. Because Sanders's fraud and misrepresentation claims were stale when filed on October 8, 2019, they should be dismissed as a matter of law.

9

III.    **Even if Sanders's Claims Were Not Barred by Limitations, Counts II, III, IV and VI Fail for the Following, Independent Reasons.**

A.    **Sanders's PSA Claims (Counts II and III) Must be Dismissed Because §213 is Inapplicable to Live Poultry Dealers and Because Sanders Has Not Properly Pled an Injury to Competition in the Market.**

Sanders purports to bring claims under §§ 192 and 213 of the Packers and Stockyards Act and various implementing regulations, alleging that Koch has unfairly discriminated against and prejudiced Sanders.  Even had these claims been timely filed, they still fail as a matter of law. Section 213 does not apply to live poultry dealers, and Sanders has failed to properly plead that Koch's alleged conduct with respect to Sanders injured or likely will injure competition.

1.    **Section 213 does not apply to live poultry dealers.**

By its plain language, § 213 applies only to "stockyard owner[s]," "market agenc[ies]" and "dealer[s],"—not to live poultry dealers like Koch:

(a) It shall be unlawful for any *stockyard owner, market agency*, or *dealer* to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with determining whether persons should be authorized to operate at the stockyards, or with the receiving, marketing, buying, or selling on a commission basis or otherwise, feeding, watering, holding, delivery, shipment, weighing, or handling of livestock.

(b) Whenever complaint is made to the Secretary by any person, or whenever the Secretary has reason to believe, that any *stockyard owner, market agency*, or *dealer* is violating the provisions of subsection (a), the Secretary after notice and full hearing may . . . .

7 U.S.C. § 213 (emphasis added). Sanders admits Koch is a live poultry dealer. [Compl. ¶¶ 9-10] This Section is therefore inapplicable to Koch and should be dismissed as a matter of law. *See* 7 U.S.C. § 201(a), (b) and (d) (defining terms).

2.    **Sanders has not pleaded and cannot plead likelihood of injury to competition sufficient to sustain his PSA claims.**

a.    **The PSA only prohibits conduct that injures, or that is likely to injure, competition.**

Contrary to Sanders's characterization of the Act, the PSA does not prohibit all unfair,

unjustly discriminatory or deceptive business practices.  [*See* Compl. ¶¶ 3, 123]  Rather, "the

purpose of the Packers and Stockyards Act of 1921 is to protect competition and, therefore, only

those practices that will likely affect competition adversely violate the Act." *Wheeler v.*

*Pilgrim's Pride Corp.*, 591 F.3d 355, 357 (5th Cir. 2009).  Thus, to properly state a § 192 PSA

claim, a plaintiff must allege "injury, or likelihood of injury, to competition." *Id*. at 363.

 In coming to its majority holding in *Wheeler*, the Fifth Circuit, sitting en banc, sought to

discern the legislative intent of the Act. The court first looked to the Act's lengthy judicial

history, specifically the Supreme Court's 1922 opinion in *Stafford v. Wallace*, 258 U.S. 495, 514

(1922). *Wheeler*, 591 F.3d at 358. There, the Court observed that "the object of the PSA was to

secure the flow of livestock from the farms and ranges to the slaughtering center and into meat

products unburdened by collusion that unduly lowered the prices to the shipper and unduly

increased the price to the consumer." *Id*. (citing *Stafford*, 258 U.S. at 514).  The Fifth Circuit

read *Stafford* as deciding "the PSA to be constitutional because it protects competition and

opposes combinations in restraint of interstate trade." *Id*.

 The court then turned to the decisions of its sister circuits, which unanimously agreed that

the Act was intended to prohibit anti-competitive business practices. For example, in *Swift & Co.*

*v. Wallace*, 105 F.2d 848 (7th Cir. 1939), the Seventh Circuit reversed the Secretary of

Agriculture's declaration that preferential discounts and trades were sufficient to violate the Act,

holding that "the decision had to take into consideration the effect that this disparate treatment

had upon competition."  *Wheeler*, 591 F.3d at 358. Later, the Seventh Circuit again set aside the

Secretary's order, holding that a 50-cent refund to purchasers of a particular brand and type of

bacon did not violate the Act, even where the discount resulted in a loss to the seller, "absent an

intent to eliminate competition or unless the effect might be to lessen competition."  *Id*. at 359.

In a case involving alleged termination of poultry grower contracts without economic justification, the Eleventh Circuit affirmed the trial court's setting aside the jury's award because the "plaintiffs failed to show that the termination of their contracts had an effect on competition." *Id*. at 360 (citing *London v. Fieldale Farms Corp*., 410 F.3d 1295, 1304 (11th Cir. 2005)). The Eleventh Circuit later "reiterated that the purpose of the PSA was not to upset the traditional principles of freedom of contract [to which the Fifth Circuit added] despite an unfair effect on the plaintiffs." *Id*. (citing *Pickett v. Tyson Fresh Meats, Inc*., 420 F.3d 1272 (11th Cir. 2005)).

The Fifth Circuit surmised that these decisions (and others not specifically addressed here) were made clearer when considered in the light of Congressional experience. During the legislative debate of the PSA, it was made plain that the statute was needed to "promote healthy competition" in light of the "Big Five" meatpackers continued "domina[nce] of the interstate meat-packing market through anti-competitive monopolistic behavior" despite attempted enforcement of the existing antitrust statutes. *Id*. at 361. And despite having amended the PSA seven times, Congress has undertaken no action that would affect the judicial interpretations of the Act to require competitive injury. *Id*. at 361-62.

**b.    The source of the PSA's terms confirm the PSA was not meant to prohibit all discrimination.**

The PSA does not expressly define the term "unjustly discriminatory" used in § 192, but, as Judge Jones observed in her *Wheeler* concurrence, courts have "a duty to give those words meaning consistent with their statutory and common-law antecedents, which were known well by the Members of the Congress that passed the Act." *Id*. at 364.  In other words, those words "were terms of art, and their meanings were fixed by judicial definition and consistent usage." *Id*.  "Words that have acquired a specialized meaning in the legal context must be accorded their *legal* meaning." *Id*. at 366 (quoting *Buckhannon Bd. & Car Home, Inc. v. W. Va. Dept. of Health & Human Res.*, 532 U.S. 598, 615 (2001)). *See also*, *id*. (quoting *Moskal v. U.S*., 498 U.S. 103,

12

121 (1990) ("More poetically, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings its soil with it.'").

The PSA was patterned in part on the Interstate Commerce Act of 1887 ("ICA").  *See id.* at 365.  The term "unjustly discriminatory" in § 192 of the PSA was borrowed from § 2 of the ICA.  *Id.* at 366, 368-69.  So, it is only appropriate to consider how the term "unjustly discriminatory" was used and interpreted with respect to the ICA.  In *Interstate Commerce Commission v. Chicago Great Western Railway Co*., 209 U.S. 108, 122 (1908), the Supreme Court held the ICA excluded conduct based upon honest competitive motives.  *See* 591 F.3d at 369.  The Court reasoned that "honest and fair [conduct as part of] effort to secure more business . . . eliminates from a case an intent to do an unlawful act, and leaves for consideration only the question whether the [conduct] established [] an undue preference or discrimination." *Id*.  The Court also held that even though carriers had near-absolute rights to reduce rates, the Commission was empowered to prohibit "excessively low" rates under ICA § 202's power to prevent unjustly discriminatory conduct. *Id*.  Judge Jones viewed this holding as further evidence that "unjust discrimination" should be interpreted as only that which injures competition. *Id*.

### c.   Sanders has not alleged and cannot allege competitive injury or a likelihood of competitive injury.

Although he contends that proof of injury to competition is not required under the PSA, Sanders baldly alleges that Koch's alleged racially motivated discrimination has and likely will have the anti-competitive effect of reducing the supply of poultry and will ultimately raise consumer prices:

> While Plaintiff Sanders contends that the likelihood of competitive injury is not a required element for stating a claim for all of the practices or devices described herein, the foregoing violations of 7 U.S.C. § 192(a) and (b) and other relevant sections of the PSA, all have the likely effect of reducing the poultry output that would have otherwise been created by the utilization of black farmers for

13

> poultry growing, which over time will impact the price paid by
> end-users, and created [sic] a likelihood of competitive injury
> within the poultry markets. In addition, a proven showing of
> competitive injury has already been demonstrated against black
> farmers. The systematic elimination of black farmers altogether
> has caused competitive injury on the poultry market which Sanders
> was engaged in, and on the poultry market in general, by reducing
> the poultry supply in the geography served by Defendant Koch in
> Mississippi.

[Compl. ¶ 123]

Courts ordinarily rely upon the "rule of reason" analysis when evaluating whether there is injury to competition: "in light of all of the relevant facts, an action is unlawful only if it is likely to suppress or destroy competition." *In re Pilgrim's Pride Corp.*, 728 F.3d 457, 462 (5th Cir. 2013) (citing *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010)). Sanders's allegations of anticompetitive injury fall flat for at least three reasons.

First, Sanders has not pleaded facts that would tend to show that this alleged decrease in poultry supply has occurred or is likely to occur. Sanders operated two farms out of the more than 1300 poultry farms in Mississippi alone. [Compl. ¶¶ 29, 21]  Sanders does not offer any factual allegations showing a plausible impact of losing his two farms on either Koch's business or the poultry market at large.  For example, Sanders does not allege how many birds he raised in any given year, nor does he allege how many birds were raised by Koch's other 172 growers[5] together, nor does he allege how many birds he raised in comparison to the number raised by all market competitors. *See London*, 410 F.3d at 1305 (identifying type of evidence to show anti-competitive injury). Moreover, critically fatal to his claim, nowhere in his Amended Complaint does Sanders allege that Koch has not, or could not, place the number of chicks previously

---

[5] [Compl. ¶ 22 (alleged number of Koch growers as of 2017)]

placed on his farms with other growers or that other poultry processors have not or could not make up for any alleged shortfall in supply.

Second, Sanders has offered no facts to support his conclusory allegation that any alleged drop in poultry supply is a result of Koch's alleged "unfair, unjustly discriminatory or deceptive" practices against him. Critical to the analysis here is Sanders's admission that his houses did not meet the two minimum requirements applicable to all Koch growers, [Compl. ¶ 35] and the absence of any allegation that they ever did.[6]  In other words, since Sanders has not pled that his houses met the minimum requirements, he has not alleged, nor could he, that Koch would have continued to place birds on his farms but for Sanders's refusal to complete the discriminatory "23 upgrades."

Like the plaintiff in *Terry v. Tyson Farms*,[7] Sanders's complaint is focused on "how Defendant's [alleged discrimination] harmed him as an individual grower," and should be similarly dismissed. 604 F.3d 272, 279 (6th Cir. 2010) (affirming dismissal because no allegation regarding how Tyson's discrimination against plaintiff affected overall competition in poultry industry).  And Sanders's attempts to bolster his case for diminished supply with vague and generalized allegations of historical discrimination by Koch against three other black growers offers nothing to support his claimed injury to competition.  Sanders does not allege that any of those other farmers were subject to the same allegedly discriminatory practice about which he complains, *i.e.*, being required to make costly upgrades not required of white growers. Indeed,

---

[6]  The natural inference to be drawn from Sanders's alleged August 17, 2017 conversation with a Koch employee is that he had not raised the static pressures in his houses even as of that date. [*See* Compl. ¶ 58]

[7]  The facts at issue in Terry Farms are nearly identical to those alleged here. There, the plaintiff had been a successful grower for some time when he alleged that Tyson threatened not to renew his contract unless he made "'costly and unnecessary' changes to his poultry operation."  604 F.3d 272, 275 (6th Cir. 2010).  The plaintiff further alleged that Tyson's threat was a pretext for discriminating against him because of "his efforts to organize growers, and in retaliation for [his] complaints to the Packers [and] Stockyards Administration." *Id*.

Sanders makes no specific allegations about Koch's alleged practices as they relate to those growers at all.  Instead, he only generally alleges that Koch refused to "give or sustain contracts" with those three black farmers for varying pretextual reasons over a span of eight years.[8] [Compl. ¶ 25]  Such vague allegations are insufficient to bring Koch's alleged practices with respect to those farmers under the same umbrella as Sanders's PSA claim.  But even if a mere allegation of racial discrimination were enough to establish a "practice," which it is not, the loss of a total of six farms [Compl. ¶ 65] spaced out over eight years is not enough to show a negative effect or likely effect on competition for the same reasons discussed above and Sanders certainly has not pled sufficient facts supporting such a conclusion.

Third, even if Sanders had sufficiently pleaded a reduction in supply of mature chickens available for processing caused by Koch's alleged racial discrimination, he has not alleged that Koch discriminated against black farmers for the *purpose* of reducing supply.  *Armour & Co. v. U.S.*, 402 F.2d 712, 720-21 (7th Cir. 1968) (violation of PSA requires intent to eliminate competitors or injure competition); *see also In re Pilgrim's Pride*., 728 F.3d at 462 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (citing *Armour*)).  Indeed, merely reducing supply, *even if intentional*, and any resulting increases in price are insufficient, standing alone, to demonstrate injury to competition.[9] *Id.* at 462-63 ("laws against anticompetitive conduct seek to protect competition, not low prices").

---

[8]  The only other black farmer about whom Sanders offers any individualized allegations is John Ingrum, but he fails to include any specific factual allegations describing Koch's alleged discrimination against Ingrum. [Compl. ¶ 26]  Sanders admits that Ingrum's "claims are too remote to be included in this suit." *Id.*

[9]  In *In re Pilgrim's Pride*, poultry growers sued Pilgrim's Pride, alleging that the poultry producer violated the PSA when it idled some of its chicken processing facilities with the intention of decreasing poultry supply to increase prices for its consumer products. *Id.* at 458-59. The growers, whose contracts were cancelled because their services were no longer needed due to the idling, claimed Pilgrim's Pride had engaged in business practices for the purpose of "manipulating or controlling prices" in violation of § 192(e).  The trial court agreed, reasoning that, given the size of the company's operations and that one of the purposes of its actions was to increase prices, the decision to idle the facilities was likely to lead to a competitive injury. *Id.* at 459-60.  The Fifth Circuit reversed, explaining that "a unilateral attempt to raise prices, without more, is not inherently illicit or anti-competitive." *Id.* at 462 (also quoting

(continued on next page)

16

In fact, Sanders's Amended Complaint, when read as a whole and assuming all factual allegations are true, states at best a claim that Koch discriminated against him solely on the basis of race and without any economic motivation.  Sanders himself alleges that Koch's reasons for refusing to deliver additional flocks to his farms was "a pretext for the actual reason, which was to discriminate against Sanders because he is black, and to squeeze him financially, put him out of the poultry business and stop and hinder him due to his race." [Compl. ¶ 111]  If supply happened to be reduced, that would be a mere byproduct of Koch's alleged racial animosity.

Sanders's complaint is really one of racial discrimination in contracting, and he has brought both breach of contract and § 1981 claims.  To transform those claims into viable PSA claims, Sanders was required to plead specific facts to show both that Koch's alleged requirement that he make "23 upgrades" was intended to injure competition and that it did in fact, or was likely to, affect competition. *See London*, 410 F.3d at 1304 ("Failure to require a competitive impact showing would subject dealers to liability under the PSA for simple breach of contract or for justifiably terminating a contract with a grower which has failed to produce as promised.").  Sanders "'naked assertion[s]' devoid of 'further factual enhancement" fall far short of the necessary pleading. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Having pleaded no set of facts entitling him to recovery, Sanders's PSA claims, even had they been timely filed, must be dismissed.

    **B.**    **Even if Sanders Had Timely Filed and Properly Pleaded Competitive Injury, Count II Fails Because He Has Pleaded No Facts to Establish a Regulatory Violation.**

In Count II, Sanders alleges various violations by Koch of regulations promulgated under the PSA.  Because his PSA claims must be dismissed for failure to plead competitive injury,

---

*Spectrum Sports*, 506 U.S. at 458 ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.")).

these regulatory claims necessarily fail as well.  Count II also fails because, as shown below, all but one of the regulations cited by Sanders either does not apply or does not prohibit any of Koch's alleged conduct.  The single remaining regulation, 9 C.F.R. § 2001.201, governs the necessary contents of poultry growing contracts, and the Agreements, on their face, establish Koch's compliance with its requirements.  Count II should be dismissed with prejudice.

### 1.      9 C.F.R. § 201.200 has no application in this case.

Section 201.200, cited by Sanders in paragraphs 98 and 122 f. of his Amended Complaint, is inapplicable to the facts in this case.  That Section, entitled "Sale of livestock to a packer on credit," prohibits the purchase of livestock on credit under certain circumstances. Koch is a "live poultry dealer," not a "packer," *compare* 7 U.S.C. § 182(9) *with* 7 U.S.C. § 191, and Sanders has made no allegation related to the purchase of livestock.

### 2.      9 U.S.C. § 201.53 does not address the type of alleged misrepresentations made by Koch.

Sanders alleges that "[t]he November 4, 2015 letter from Defendant Koch mandating twenty-three upgrades, and other pretextually and discriminatorily motivated reasons given verbally, in writing and found to be true by the USDA, for Koch stopping the delivery of birds on Sanders's farm on or about November 20, 2015, [] are in contravention of 9 C.F.R. § 201.53." [Compl. ¶103]  Even if Koch's alleged statements about the "upgrades" or why it refused to place flocks with Sanders were false or misleading, which Koch denies, those are not the type of false or misleading statements prohibited by § 201.53.  Indeed, that Section, by its plain language, prohibits only false or misleading statements "concerning the market conditions or the prices or sale of any livestock, meat, or live poultry." 9 C.F.R. §201.53.  Because there is no allegation that Koch misrepresented market conditions, prices or sales, this claim fails as a matter of law.

3.      **Sections 201.216 and 201.217 do not prohibit conduct, but instead merely provide criteria the Secretary *may* consider in determining whether the PSA has been violated.**

a.      **Section 201.216**

Sanders alleges that "Koch's November 15 [sic], 2015 letter forcing Sanders to conduct twenty-three upgrades" and its "actual termination of Plaintiff Sanders's Broiler Growing Agreement[10] without lawful notice and by ceasing to provide chickens under the Agreement violated 9 C.F.R. § 201.216." [Compl. ¶¶ 96-97]  But § 201.216 does not purport to regulate by prohibiting any particular conduct. Rather, the regulation lists criteria that the Secretary *may* consider in determining whether requirements of additional capital investment violate the PSA:

The Secretary *may consider* various criteria in determining whether a requirement that a poultry grower or swine production contract grower make additional capital investments over the life of a production contract or growing arrangement constitutes a violation of the Act. These criteria include, but are not limited to:

(a) Whether a packer, swine contractor or live poultry dealer failed to give a poultry grower or swine production contract grower discretion to decide against the additional capital investment requirement;

(b) Whether the additional capital investment is the result of coercion, retaliation or threats of coercion or retaliation by the packer, swine contractor or live poultry dealer;

(c) Whether the packer, swine contractor or live poultry dealer intends or does substantially reduce or end operations at the slaughter plant or processing facility or intends or does substantially reduce or end production operations within 12 months of requiring the additional capital investment, absent the occurrence of a catastrophic or natural disaster, or other emergency, such as unforeseen bankruptcy;

(d) Whether the packer, swine contractor, or live poultry dealer required some poultry growers or swine production contract growers to make additional capital investments, but did not require other similarly situated poultry growers or swine production contract growers to make the same additional capital investments;

(e) The age and number of recent upgrades to, or capital investments in, the poultry grower's or swine production contract grower's operations;

---

[10] Koch never terminated Sanders's contracts. [Compl. ¶ 140]

(f) Whether the cost of the required additional capital investments can reasonably be expected to be recouped by the poultry grower or swine production contract grower;

(g) Whether a reasonable time period to implement the required additional capital investments is provided to the poultry grower or swine production contract grower; and

(h) Whether equipment changes are required with respect to equipment previously approved and accepted by the packer, swine contractor, or live poultry dealer, if existing equipment is functioning as it was intended to function unless the packer, swine contractor, or live poultry dealer provides adequate compensation incentives to the poultry grower or swine production contract grower.

9 C.F.R. §201.216 (emphasis added).  Even if all of the criteria were met, the regulation does not require a finding of violation by the Secretary, much less proscribe any specific action or inaction by a poultry processor.  This claim therefore fails as a matter of law.

### b.      Section 201.217

Sanders's § 201.217 claim fails for the same reason. Sanders alleges that Koch's failure to provide notice to him of his alleged breach of the Agreements violated § 201.217, but again, that Section simply provides that the failure to give notice is just one criterion that the Secretary *may* consider:

The Secretary *may consider* various criteria when determining whether a packer, swine contractor or live poultry dealer has provided a poultry grower or swine production contract grower a reasonable period of time to remedy a breach of contract that could lead to contract termination. . . . These criteria, include, but are not limited to:

(a) Whether the packer, swine contractor or live poultry dealer provided written notice of the breach of contract to the poultry grower or swine production contract grower upon initial discovery of that breach of contract if the packer, swine contractor or live poultry dealer intends to take an adverse action, including termination of a contract, against the poultry grower or swine production contract grower based on that breach of contract by the poultry grower or swine production contract grower; . . .

9 C.F.R. § 201.217 (emphasis added).[11]   Contrary to Sanders's contention, this Section does not

mandate notice. Thus, Sanders's § 201.217 claim fails.

### 4.    Sanders's Agreements complied with § 201.100.

Sanders alleges that "[t]he terms of the Broiler Growing Agreement, including the

termination provision, violate 9 C.F.R. § 201.100. . . ." [Compl. ¶ 102] Regarding poultry

growing contracts, § 201.100 requires that each contract "clearly specify" the following:

> (1) The duration of the contract and conditions for the termination of the contract by each of the parties;
>
> (2) All terms relating to the payment to be made to the poultry grower, including among others, where applicable, the following:
>
> (i) The party liable for condemnations, including those resulting from plant errors;
>
> (ii) The method for figuring feed conversion ratios;
>
> (iii) The formula or method used to convert condemnations to live weight;
>
> (iv) The per unit charges for feed and other inputs furnished by each party; and
>
> (v) The factors to be used when grouping or ranking poultry growers; and
>
> (3) Whether a performance improvement plan exists for that grower, and if so specify any performance improvement plan guidelines, including the following:
>
> (i) The factors considered when placing a poultry grower on a performance improvement plan;
>
> (ii) The guidance and support provided to a poultry grower while on a performance improvement plan; and
>
> (iii) The factors considered to determine if and when a poultry grower is removed from the performance improvement plan and placed back in good standing, or when the poultry growing arrangement will be terminated.

9 C.F.R. § 201.100(d).  This claim also fails because, as outlined below, each of these requisite

provisions is included in both the Carlton Sanders and Cory Sanders Agreements:

| Regulatory Provision | Carlton Sanders Agreement | Cory Sanders Agreement |
|---|---|---|

---

[11] Section 201.217 also expressly provides that "[t]hese criteria do not limit a packer, swine contractor or live poultry dealer's rights under a contract or agreement where food safety or animal welfare is concerned." *Id.*  The minimum static pressure was increased by Koch, as permitted by its Agreements with Sanders, to address animal welfare (ensure the chicks were kept warm in the winter) [Compl. ¶¶ 34, 40], so Koch was justified in enforcing its contractual rights to refuse additional flocks until the requirement was met.

| 200.100(1) | Exhibit A, at §§ 7, 9, 18 | Exhibit B, at §§ 7, 9, 18 |
| 200.100(2)(i) | Exhibit A, at § 4, Schedule A §1(B) | Exhibit B, at § 4, Schedule A §1(B) |
| 200.100(2)(ii) | Exhibit A, at Schedule A §§ 1(C), (D) | Exhibit B, at Schedule A §§ 1(C), (D) |
| 200.100(2)(iii) | Exhibit A, at Schedule A § 1(B) | Exhibit B, at Schedule A § 1(B) |
| 200.100(2)(iv) | Exhibit A, at Schedule A § 1(C) | Exhibit B, at Schedule A § 1(C) |
| 200.100(2)(v) | Exhibit A, at Schedule A § 1(D) | Exhibit B, at Schedule A § 1(D) |
| 200.100(3)(i) | Exhibit A, Addendum A | Exhibit B, Addendum A |
| 200.100(3)(ii) | Exhibit A, Addendum A | Exhibit B, Addendum A |
| 200.100(2)(iii) | Exhibit A, Addendum A | Exhibit B, Addendum A |

## C.   Sanders's Fraud Claim (Count IV) Should Be Dismissed.

Sanders alleges that Koch promised that "if he grew good birds, he would continue to receive placements of baby chicks," [Compl. ¶ 126; *see also* Compl. ¶ 145], and made other promises regarding his future compensation and Koch's "institutional commitment to ensure that he would receive a reasonable return on his investment." [Compl. ¶ 133]  None of those promises is incorporated into either Agreement.  *See* Exhibits A & B.  According to Sanders, Koch committed fraud by breaking those oral promises—some 13 years after they were supposedly made. [Compl. ¶ 146]

Sanders's fraud claim, however, should be dismissed because such promises of future conduct are insufficient to support a fraud claim as a matter of Mississippi law. *See, e.g., Moran v. Farley*, 919 So. 2d 969, 976 (Miss. 2005) ("A successful claim for fraudulent representation must relate to past or present existing facts, and cannot be based on a promise, except where a contractual promise is made with the present undisclosed intention of non-performance.").  Sanders's conclusory allegations that he relied on "promises that turned out to be false and which Defendants knew were false at the time the promises were made" some thirteen years earlier are

implausible and therefore insufficient as a matter of law to support a fraud claim.  [Compl. ¶ 143]  *See Brune v. Takeda Pharma. U.S.A., Inc.,* 2019 WL 3323511, at *4 (S.D. Miss. July 24, 2019) ("'[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'") (quoting *Iqbal,* 556 U.S. at 678).

In any event, Sanders's fraud claim should be dismissed for failure to plead with the requisite particularity. To succeed on a claim for fraud, Mississippi law requires a plaintiff to prove by clear and convincing evidence:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Cascade Capital Grp., LLC v. Livingston Holdings, LLC*, No. 3:17-cv-952-LG-FKB, 2018 WL 4288706, at *2 (S.D. Miss. July 31, 2018) (quoting *M. St. Invs., Inc. v. Zurich Am. Ins. Co.*, No. 3:13-cv-878-DCB-MTP, 2014 WL 1326105, at *2 (S.D. Miss. Mar. 28, 2014)).

In determining the sufficiency of the pleadings, "state-law fraud claims are subject to the pleading requirements of [Federal] Rule 9(b)." *Id.* (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338-39 (5th Cir. 2008)).  The heightened pleading requirement imposed by Rule 9(b) is strictly interpreted by the Fifth Circuit and requires "a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent."  *Id.* at *3 (quoting *Dorsey*, 540 F.3d at 339).  "Put simply, Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue."  *Id.*

Sanders's Amended Complaint fails to set forth the who, what, where, when, and how. Sanders alleges simply that Koch represented to him that "if he grew good birds, he would continue to receive placements of baby chicks from Koch." [Compl. ¶126]  In a nutshell, Sanders

seems to complain that he was fraudulently induced to contract with Koch by Koch's alleged oral promises that Sanders would continue to receive chickens and make a guaranteed return on his investment in his farms.  [*See also* Compl. ¶¶ 133, 143, 145, 148]  But Sanders has failed to plead any of the requisite details such as who made the representation, precisely what representation was made, or when and where the representation was made.  For this reason, Sanders's fraud claims should be dismissed.

> **D.**     **Sanders Has Not Alleged, and Cannot Allege, the Necessary Elements of a Misrepresentation Claim (Count VI).**

To properly plead a misrepresentation claim under Mississippi law, a plaintiff must allege: "(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance." *Horace Mann Life Ins. v. Nunaley*, 960 So. 2d 455, 461 (Miss. 2007).  As Sanders's Amended Complaint makes clear, he has not, and cannot, plead elements (1) and (5).

With regard to this claim, Sanders alleges that "Koch represented to Plaintiff Sanders that it would not place birds on Sanders's farm if [sic] did not perform unlawful, expensive, impossible and unrealistic upgrades and demands." [Compl. ¶ 156]  Sanders, however, has failed to plead a misrepresentation.  Indeed, Sanders has actually pleaded the opposite: that it was Koch's intent to refuse to place flocks on Sanders's farms unless he complied with "23 upgrades" not required of white farmers and that Koch actually did so.  [*See, e.g.*, Compl. ¶ 116]  These facts do not allege a misrepresentation made by Koch to Sanders.

Sanders's misrepresentation claim also fails because he cannot show that his damages were proximately caused by Koch's alleged misrepresentations.  Sanders alleges that Koch's

refusal to place additional flocks on his farms caused his damages, but he admits that none of his houses met the minimum static pressure required of all Koch poultry growers (and concedes they never did). [Compl. ¶ 35] Sanders was obligated to meet all of Koch's housing requirements, including meeting the minimum static pressure, "before receiving chicks." Exhibits A and B, § 2D. Thus, Sanders cannot show that his damages were caused by anything other than his refusal to comply with his obligations. Sanders's misrepresentation claim should be dismissed with prejudice.

## CONCLUSION

For all of the reasons set forth above, Koch respectfully requests that the Court dismiss Counts II through VI of Plaintiffs' Amended Complaint with prejudice.

Respectfully submitted December 6, 2018.

*/s/Scott W. Pedigo*
SCOTT W. PEDIGO

**OF COUNSEL:**

Scott W. Pedigo (MS Bar No. 10735)
Amy L. Champagne (MS Bar No. 102477)
R. Christopher White (MS Bar No. 105509)
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, P.C.
One Eastover Center
100 Vision Drive, Suite 400 (39211)
P.O. Box 14167
Jackson, Mississippi 39236
Telephone: (601) 351-2400
Facsimile: (601) 351-2424
spedigo@bakerdonelson.com
achampagne@bakerdonelson.com
rcwhite@bakerdonelson.com

Attorneys for Koch Foods, Inc.; Koch Farms of Mississippi, LLC; and Koch Foods of Mississippi, LLC