**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CARLTON SANDERS and
STEPHEN H. SMITH as Chapter 7 Bankruptcy
Trustee for CARLTON SANDERS**                                                    **PLAINTIFFS**

**vs.**                                                **CIVIL ACTION NO.:   3:19-cv-721-DPJ-FKB**

**KOCH FOODS, INCORPORATED;
KOCH FARMS OF MISSISSIPPI, LLC, and;
KOCH FOODS OF MISSISSIPPI, LLC**                                           **DEFENDANTS**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

Come now Plaintiffs and in opposition to Defendants' Motion to Dismiss state as follows:

**INTRODUCTION**

Without addressing continuing violations, tolling or ratification, and contrary to the contentions of Defendants, Koch Foods, Incorporated, Koch Farms of Mississippi, LLC, and Koch Foods of Mississippi, LLC ("Defendants"), Counts II and III of this lawsuit were timely filed within the four-year statute of limitations deemed applicable to the Packers and Stockyards Act ("PSA") by federal circuits applying the statute of limitations set forth in the Sherman Act. Defendants concede suit could be deemed to have been timely filed within four years of October 10, 2015 or November 4, 2015, the dates Defendants told Plaintiff Carlton Sanders that he must perform 23 upgrades that no other farmer, all white, were given,[1] or within December 2015, when Sanders went to the USDA for help. [Doc. 8, ¶¶ 36, 38, 42-44, 46-50, 54, 65, 67, 78, 100, 103,

---

[1] Defendants assert that they compiled the list because Sanders asked them to move up from Class B to Class A chickens. (Doc. 15, P. 3). However, Sanders stated in an affidavit dated September 20, 2018, that he did not ask for this change (he has always grown Class B chickens). In any event, this assertion makes no sense since the list: a) included items that exceeded what was needed for Class A specifications; b) included items required for brand new versus existing housing; c) used the word "must" six times, d) would have cost several hundred thousand dollars to fulfill; e) Defendants refused to cooperate with Sanders's lender, PriorityOne Bank, to help Sanders obtain the requisite funds, and; f) it would be impossible to complete the items listed in a matter of weeks by a November 2015 deadline. [Doc. 8, ¶¶ 38, 42, 65, 67].

1

115-116, 148].

Counts II-III (the PSA claims) and Counts IV-VII (the state claims) were timely filed and include, but are not limited to the following trigger dates:  October 10, 2015 (the date Defendant Koch employees told Plaintiff Sanders he would have to complete 23-upgrades instead of one); November 4, 2015 (the date Defendant Koch employees put the 23-upgrade list in writing); November 20, 2015 (the date Defendants picked up the last flock of chickens from Sanders's farms); October/November 2015 (the period when Defendants impeded and refused to cooperate or work with Sanders's lender to block Sanders's ability to borrow the several hundred thousands of dollars in additional funds he needed to perform the 23-item list); December 2015 when Sanders went to the United States Department of Agriculture ("USDA") for help; March 17, 2016 (the date Defendants emailed the USDA and denied that the 23-items were upgrades, claiming instead that they were "minimum specifications for broiler housing that would become effective for placements on or after November 1, 2015); July 6, 2017 (the date of the "Exit Interview"); August 17, 2017 (the date a Defendant Koch employee told Sanders he could get birds delivered again if he raised his static pressure); September 13, 2013 (the date Defendants refused in writing to commit to resuming the delivery of birds even if Sanders's did ten of the 23 items on the list); September 21, 2017 (when the USDA confirmed Defendants refusal to commit to resume the delivery of chickens even if Sanders's performed ten of the 23 items on the list and told Defendants that Sanders's contracts were still in place because Defendants had never complied with the 90-day termination notice requirement)[2]; September 20, 2018, when Sanders had still not received his December 4 and 18, 2015 Broiler Service Reports from Defendants; late September 2018 when

---

[2]In an email dated September 21, 2017 from the USDA (GIPSA) to Defendants, the USDA reiterated and confirmed Defendants' continuing refusal to place chickens back on Plaintiff Sanders's farms or give proper and lawful termination notice to him.  [Doc. 8, ¶¶ 71, 78, 118, 138, 140-41].

Sanders was forced out of his home; December 2018, when Sanders was forced to file for bankruptcy; May 8, 2019, when Sanders's home, farm and property were sold in foreclosure to a relative of Defendants' employees for $21,000 less than what had been offered by a non-relative of Defendants' employees); October 2, 2019 when the relative of Defendants' employees posted Sanders's former farm property for sale as a beautiful home on rolling acreage on the internet at a price double what he paid for it), and; during the week of July 22, 2019, when a Defendant Koch employee told a caller from Capitol Hill in Washington, D.C. that Defendants stopped delivering chickens to Sanders because Sanders was a bad business man and a gambler in retaliation of Sanders going to the USDA.  These events occurred since October 10, 2015 and are well within both three and four-year statutes of limitation.[3]

Defendants suggest three trigger dates for the statute of limitation:  October 10, 2015, when Defendants' employees spoke with Plaintiff Sanders about the long list of upgrades he would have to comply with that far exceeded what was in the February 2, 2015 letter to all farmers [Doc. 14, Exhibit C]; November 4, 2015, the date of the 23-Item upgrade letter [Doc. 8, ¶¶ 38, 42, 67], and; December 2015, when Plaintiff Sanders's went to the USDA for help.  Defendants' focus on the earliest dates is misleading and attempts to undermine the applicability in this case of the continuing violations doctrine (or equitable tolling, ratification, or estoppel theories), as defined by the Fifth Circuit.  *See*, *e.g., Merchants & Marine Bank v. Douglas-Guardian Warehouse Corp.*, 801 F. 2d, 745 (5the Circuit 1986), and its progeny.  Defendants reliance on a few historic

---

[3]These dates are alleged in the Amended Complaint [Doc. 8, ¶¶ 38, 42-43, 45, 49, 50, 56-59, 65-68, 71-72, 74, 78-79, 118, 135, 137-141, 147].  The FOIA search results for 2018-AMS-01797-F (1st Interim), pages 183-186, dated November 25, 2016, contain a chronology, but it is completely redacted.  Plaintiffs timely appealed the redactions to the USDA and is awaiting a decision.  The redacted chronology is attached as Exhibit 1, to be considered similarly to Exhibit C (Defendants attached letter dated February 2, 2015, setting forth only two mandatory upgrades that all farmers received), because it is "referred to in the pleadings and is central to Plaintiffs' claims." [Doc. 15, P. 2].

documents that in isolation help their cause precludes any number of documents (1,097 to be exact from the two USDA investigations alone) from the story.  At the very least, the timeline could even continue passed September 13, 2017 and through the second USDA investigative report dated May 8, 2019, and the USDA's two separate findings of *Unjust Discrimination and Undue or Unreasonable Prejudice or Disadvantage* under the PSA [Doc. 8, ¶¶ 65, 67].

   It is additionally pertinent that Defendants have never lawfully severed their contracts with Plaintiff Sanders under the PSA, 9 C.F.R. § 201.100(h)(1) and (2), or the terms of the contracts themselves [Doc. 14, Exhibits. A-B].  Sanders has never been given his required 90-day written termination notice, so he could still technically be under contract with Defendants [Doc. 8, ¶¶ 65, 71, 86.e, 122.f, 140).  While the USDA raised this with Defendants on September 21, 2017 (Exhibit 2), Defendants have not to date complied with the law set forth in the PSA.

Defendants' participation in the USDA investigation itself, their engaging in discussions from July to September 2017 to re-begin deliveries of chickens to Plaintiff are trigger dates from which the statutes of limitation run.  The re-delivery of chickens by Defendants never materialized because Defendants insisted that Sanders comply with 21 more upgrades than other farmers, all white, had to comply with.  Even when this was narrowed down to ten with the USDA during the summer and fall of 2017, Defendants still refused to commit to complying with the terms of their contracts with Plaintiff Sanders.  This amplifies the disingenuous argument in Defendants' motion to dismiss that all Sanders ever had to do was increase his static pressure by .05 to comply with the same demands put on the other farmers.  Defendants likewise impeded Sanders's ability to borrow more money from his lender, PriorityOne Bank, which Defendants knew was the only way Sanders could obtain the money to make several hundred thousand dollars in upgrades and do so

at lightning speed.[4]

Plaintiffs concede that they made several PSA citation scrivener's errors in their Amended Complaint and these are easily remedied and do not prejudice Defendants.

While not binding precedent, given the steep learning curve required to grasp the nearly 100 year old history and enforcement of the PSA, Plaintiffs refer this Honorable Court to three well-articulated Orders from federal circuit judges in the Fourth, Sixth and Eleventh Circuits which articulately analyze the PSA in a helpful manner. *See* Exhibit 3 (*Echols v. Pilgrim's Pride*, Case 3:18-cv-00100, Doc. 40 (M.D. Ga, April 5, 2019); Exhibit 4 (*Breaking Free, LLC and Connie Buttram* [a woman] *v. JCG Foods of Ala., LLC*, 4:18-cv-01659, Doc. 46 (N.D. Ala. April 8, 2019), and Exhibit 5 (*M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, Case 2:15-cv-00032 (N.D. W.Va., October 26, 2016). These are intended only as useful tools for understanding the roles of the integrators, the farmers, and the notion of competitive harm, which have not yet been addressed in this context of race discrimination in any other decisions, published or unpublished, that Plaintiffs could find. It is notable that *Breaking Free, LLC* (Exhibit 4) addresses sex discrimination because Connie Buttram is a female poultry farmer.

This is not a case where the statute of limitations has run on either state or federal claims, competitive harm applies or has been improperly pleaded as it relates to race discrimination, or where scrivener's errors are fatal to any claims. Counts II to IV should not be dismissed.

---

[4] Plaintiffs have been unable to ascertain what role PriorityOne Bank played with Defendants in preventing Plaintiff Sanders's from obtaining the additional funds he needed (several hundred thousand dollars) to comply with Defendants' demands. The bank refused to cooperate with the USDA after June 29, 2016 and stated that it needed a subpoena before it would provide documents (Exhibit 2). The bank handled the foreclosure sale, sold the property in 2019 to a relative of Defendants' employees and refused to sell the property for $21,000 more to Cory Sanders through a loan he obtained from Regions Bank. [Doc. 8, ¶ 78].

## THE AMENDED COMPLAINT IS SUFFICIENT TO DEFEAT DISMISSAL

Plaintiffs' 60-page 160 paragraph Amended Complaint contains ample factual matter to be accepted as true and states claims that are plausible on their face as required under Federal Rule of Civil Procedure 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The factual allegations are enough to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Factual allegations must "raise a reasonable expectation that discovery will reveal evidence of' plaintiffs' claims. *Id.* at 556. However, the rule "does not permit dismissal of a well-pleaded complaint simply because it strikes a judge that actual proof of those facts [is] improbable." *Watts v. Fla. Int'l Univ.*, 495 F. 3d 1289, 1295 (11th Cir. 2007) *quoting* Twombly, 550 U.S. at 445. The Motion to Dismiss should be denied.

## THE PSA CLAIMS WERE TIMELY FILED AND SHOULD NOT BE DSIMISSED

The PSA does not provide a statute of limitations. Thus, the four-year statutes of limitations period set forth in the Sherman Act, 15 U.S.C. § 15(b) and the Civil Rights Act, 42 U.S.C. § 1981 (applying the catchall from 28 U.S.C. § 1658) are the most analogous federal statutes and are due to be applied to the alleged PSA violations (Counts II and III). *See, e.g., Wheeler v. Pilgrim's Pride Corp.*, 591 F. 3d 355, 363 (5th Cir. 2009).

Defendants claim that Plaintiff Sanders should have known that he had suffered injury on October 10, 2015 or by December 2015 at the latest. [Doc. 15, Pgs. 5, 8]. Sanders filed his original complaint on October 8, 2019, less than four years from Defendants' first claimed date of injury. "Claims under the Packers and Stockyards Act, 7 U.S.C. § 209(b), must also be brought within four years after an action accrues. *Varner v. Peterson Farms*, 371 F. 3d 1011, 1019 (8th Cir. 2004), *citing Jackson v. Swift-Eckrich, Inc.*, 53 F. 3d 1452, 1460 (8th Cir. 1995) (PSA claims are governed

by the four-year statute of limitations borrowed from the Sherman Antitrust Act). The filing of the original Complaint was timely.

### 1. The *Wheeler* decision favors predictability in PSA claims relating to the statute of limitations

The Fifth Circuit reviewed the PSA in *Wheeler v. Pilgrim's Pride Corp.*, 536 F. 3d 455 (5th Cir. 2008). In the initial opinion, the Court held "that sections 192(a)-(b) do not require a plaintiff to prove an adverse effect on competition to prevail thereunder. *Id.* at 462. The Court ruled against the opinions of other circuits. The *en banc* Court granted rehearing in *Wheeler*, 591 F. 3d 355 (5th Cir. 2009) and reversed the decision. The Court held:

> The law rules best by being predictable and consistent. It is predictability that enables people to plan their investments and conduct, that encourages respect for law and its officials by treating citizens equally, and that enables an adversary to settle conflict without going to court in the hope of finding judges who will choose a favored result. Predictability requires the judge deciding a case to set her course to reach the judgment that another, fully informed of the evidence and precedent, would expect. Predictability must be the lodestar. We must not be affected by personal preference, or by different notions of justice or what the law ought to be.

*Wheeler v. Pilgrim's Pride Corp.*, 591 F. 3d 355, 363 (5th Cir. 2009).

Defendants rely upon the *Wheeler* reversal opinion throughout their brief. The Court reversed its earlier decision in the same case in favor of predictability in the application of PSA claims. Applying the state statute of limitations would frustrate the predictability of the PSA.

### 2. The Sherman Act contains the proper borrowing limitations period

Plaintiffs were only able to find a single opinion which addressed the statute of limitations for a PSA claim. The Western District Court in Arkansas reviewed the PSA statute of limitations in *Jackson v. Swift-Eckrich*, 830 F. Supp. 486 (W.D. Ark. 1993). The Eighth Circuit later supported the District Court's ruling. *Varner v. Peterson Farms*, 371 F. 3d 1011, 1019 (8th Cir.

2004).  The District Court was tasked with borrowing a state or federal statute of limitations for application in PSA claims.  The Court ruled:

> Keeping in mind the principles set forth in *Lampf*[5] and quoted above, the court believes that the appropriate statute of limitations is the four-year limitation provision found in the Sherman Anti-trust Act, 15 U.S.C. § 15b.  The court believes the anti-trust act affords a closer fit with the PSA than do any of the state law causes of action considered by the court or the AFPA.  Both acts are aimed at regulating anticompetitive trade practices.  As the court in *Farrow* noted, the provisions of the PSA are in accord with the basic antitrust blueprint of the Sherman Act. *Farrow*, 760 F. 2d at 214.  Therefore, the court will "borrow" or "subsume" and apply to the PSA allegations of the complaint the four-year statute of limitations period provided by 15 U.S.C. § 15b.

*Jackson v. Swift-Eckrich*, 830 F. Supp. 486, 499 (W.D. Ark. 1993).

The Arkansas District Court in *Jackson v. Swift-Eckrich* reviewed the Arkansas Unfair Practices Act for application of the limitations period to PSA claims.  The Arkansas Unfair Practices Act is akin to the Mississippi Antitrust Act.  Defendants argued that the "legislative intent of the [Mississippi Antitrust Act, Miss. Code Ann. § 75-21-1, *et seq.*] is to 'suppress' all trust and monopolies," and that the Act "shall be liberally construed in all courts to the end that trusts and combines may be suppressed, and the benefits arising from competition in business preserved to the people of this state."  Doc. 15, p. 6 (citing *Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *4 (Miss. Ch. Ct. Jan. 17, 2006), *quoting* Miss. Code Ann. § 75-21-39).

The District Court held that the purpose of the Arkansas Unfair Practices Act is "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." *Jackson* at 498, *quoting* Ark. Code Ann. § 4-75-202 (Repl. 1991).  The Court also noted that the Arkansas Act itself failed to include a limitation period. *Id.*

---

[5]*Lampf, Pleva, Lipkind, Prupis, Petigrow v. Gilbertson*, 501 U.S. 350 (1991).

The Mississippi and Arkansas acts are similar in intent. Neither Act applies a limitation period, but rather borrows the catch-all limitation period from their respective state. Mississippi applies a three-year period and Arkansas applies a five-year period. The Arkansas Court held that it would not be appropriate to apply its own state's statute of limitations to an act which does not itself contain its own statute of limitations. *Id.* Defendants' assertions that Mississippi's three-year statute of limitations should be denied. Alternatively, if allowed, they should be deemed irrelevant since Defendants ratified Plaintiff Sanders's forced inability to comply with one upgraded in the face of demands to comply with 23-Upgrades, made it impossible for Sanders to comply and later engaged in conduct that constitutes continuing violations extending the statute of limitations to within a number of three-year time frames. Equitably tolling likewise applies.

    **3.**    **Application of the Mississippi Antitrust Act limitation period will frustrate the policies underlying the PSA.**

"The multistate nature of [the federal cause of action at issue] indicates the desirability of a uniform federal statute of limitations. With the possibility of multiple states limitation, the use of state statutes would present the danger of forum shopping and, at the very least, would 'virtually guarante[e]…complex and expensive litigation over what should be a straightforward matter.'" *Lampf, Pleva, Lipkind, Prupis, Petigrow v. Gilbertson*, 501 U.S. 350, 357 (1991), c*iting Agency Holding Corp.*, 483 U.S. 143, 154 (1987), *quoting* Report of the Ad Hoc Civil RICO Task Force of the ABA Section of Corporation, Banking and Business Law 392 (1985).

The PSA impacts courts in a minimum of seven circuits according to the Fifth Circuit. (Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh). *Wheeler* at 360. The seven circuits represent more than half of the states in the United States. Poultry farms exist throughout the United States and Defendants do business in many of these states. Additionally, the PSA reaches beyond the poultry business. The poultry, livestock, and swine operations reach many states. The

9

application of state statute of limitations would undermine the implementation of the PSA as each of the fifty states would result in widely varying limitations periods. *Prostar v. Massachi*, 239 F. 3d 669, 676 (5th Cir. 1997).

The four-year statute of limitations borrowed from the Sherman Antitrust Act should be applied in this case to provide predictability and consistence to PSA claims. Section 1981 of the Civil Rights Act likewise has a four-year statute of limitations. The Amended Complaint addresses competitive harm in the antitrust context framed by race discrimination that is difficult to put in words without offending a population of people that deserve better. Complaint (Doc. 8, ¶ 123).

This case tells the story of a poultry farmer, the last black poultry farmer growing for Defendants, who was unfairly discriminated against by Defendants, a billion dollar food integrator, who controlled every aspect of his poultry growing operations, while he bore all the risk. In view of the history of racism, particularly in Mississippi, this final elimination of its black farmers gave Defendants the perception in the industry of a competitive edge with their competitors (despite how repugnant this notion is). Sanders' PSA claim was filed within the applicable four-year limitation periods under both these federal statutes and should not be dismissed. *See, e.g., Buttram* Order (Exhibit 4).

**Mississippi's Antitrust Act does not provide the most analogous state cause of action.**

Defendants assert that Plaintiffs cannot show a likelihood of competitive harm as required by the PSA, an antitrust statute, but still argue that the three-year statute of limitations set forth in Mississippi's Antitrust Act applies instead. This is a contradiction and Defendants cannot have it both ways. If proving competitive harm is a necessary element, then the federal Sherman Act's four-year statute of limitations should be applied.

*Swift-Eckrich* addressed whether the district court should have applied the two-year

limitations period of the Agricultural Fair Practices Act (AFPA), 7 U.S.C. § 2305(c). The AFPA was enacted by Congress to protect the rights of farmers and other producers of agricultural commodities to join cooperative associations. The focus of the AFPA is thus rather narrow. Because the PSA has its origins in antecedent antitrust legislation and primarily prevents conduct which injures competition, it was held that the district court did not err in applying the Sherman Act's statute of limitations of four-years to the PSA claims. This is the same statute of limitations period set forth in Section 1981 of the Civil Rights Act. Four-years is the applicable time frame.

### BECAUSE VIOLATIONS OCCURRED WITHIN THREE AND FOUR YEARS OF FILING SUIT, AND THEY WERE ONGOING AND CONTINUING, THIS CASE IS NOT BARRED BY ANY STATUTE OF LIMITATIONS, FEDERAL OR STATE

Neither the language of the PSA nor the alleged expiration of an applicable limitations period present obstacles to Plaintiffs' case under the PSA or state law claims. The injury alleged by Plaintiff Sanders is continuing, suffered anew each time Defendants failed to comply with the regulations set forth in the PSA. Injuries occurred again when Defendants failed to comply with the 90-day termination requirement. This violation has run long past Defendants' last delivery of birds to Sanders's farm. Another violation occurred when Defendants refused to re-deliver birds on September 13, 2017, even though Plaintiff Sanders was willing to comply with not just the one item of the two set forth in the February 2, 2015 letter that went to all farmers, but eight more items from the 23-item list. Defendants conduct from July 2017 to September 2017 undermines their position that all Sanders had to do was comply with the two February 2, 2015 mandates.

Defendants do not cite a single instance when a case in this context was dismissed because it was time-barred based on a statute of limitations under either the PSA or state law claims. That is because this is a unique set of facts and the alleged actions consist of ongoing violations. The violations began when Defendants began forcing Plaintiff Sanders to expend hundreds of

thousands of dollars they knew he did not have to perform 23 instead of just one upgrade, impeded his ability to obtain funding through his bank, PriorityOne, to perform these upgrades, and forced this upon Sanders on the eve of the deadline when no other farmer, all white, has the same insurmountable obstacles to contend with.  However, Defendants do not stop there, as the violations continued through at least September 21, 2017, as laid out above, if not through 2019 when the property was foreclosed on and sold to a relative of Defendants' employees for $21,000 less than the prior offer.

"A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred, and the pleadings fail to rase some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F. 3d 359, 366 (5th Cir. 2006).  However, "in order for a defendant to prevail on the basis of limitations at the pleadings stage, the plaintiff must normally plead [it]self out of court." *Howard v. CitiMortgage, Inc.*, No. 1:13-cv-543-KS-MTP, 2014 U.S. Dist. Lexis 167842, at *11 (S.D. Miss., Dec. 2, 2014) (Exhibit 6), *citing TIB-The Indep. Bankers Bank v. Canyon Cmty. Bank*, 13 F. Supp. 3d 661, 666 (N.D. Tex. 2014), *quoting W. Fork Partners, L.P. v. Chesapeake Exploration, L.L.C.*, 2009 WL 2252505, at *5 (N.D. Tex. July 29, 2009).  "Both the Fifth Circuit and this Court have accepted an argument of 'continuing breach' and rejected a statute of limitations of defense." *Lucas v. Evans*, No. 2:16-cv-10-KS-MTP (S.D. Miss. 2016) (Exhibit 7), *citing Merchants & Marine Bank v. Douglas-Guardian Warehouse Corp.*, 801 F. 2d 742, 745 (5th Cir. 1986); *Howard*, 2014 U.S. Dist. Lexis 167842, at *16-17; *Singing River Elec. Power Ass'n v. Bellsouth Telecomms.*, No. 1:10-CV-486-LG-RHW, 2011 U.S. Dist. Lexis 124113, 2011 WL 5082235, at *7 (S.D. Miss., Oct. 26, 2011).

Plaintiffs agree that the legal conclusions set forth in a complaint "must be supported by factual allegations" and "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Id.*, *quoting Iqbal*, 556 U.S. at 664, 678 [Doc. 15, p. 5].  Uniquely, Sanders's complaint is supported by a 1,097-page investigation conducted by the USDA, including extensive interviews and affidavits, and two separate unequivocal findings of ***Unjust Discrimination and Undue or Unreasonable Prejudice or Disadvantage*** under the PSA.

The following are among the 160 paragraphs set forth in the Amended Complaint:

> 59.  When the USDA presented its findings to the Defendant Koch's executives in July 2017, the evidence of discrimination was included, as well as a narrower violation:  that Koch failed to notify Sanders as to why it had stopped delivering chickens to his farm, as required under the PSA's 90-day notice requirement set forth in 9 CFR § 201.100(h).  This notice requirement is also applicable under Mississippi common law requiring a reasonable notice of the termination of a contract, and at least one federal judge in Mississippi has agreed that 90 days is reasonable.

> 60.  In response to the USDA's finding of no notification to Plaintiff Sanders, Defendant Koch asserted that the general notification allegedly sent to all farmers nine months earlier, in February 2015, about the new ventilation requirements (wind speed and static pressure) was enough to give Plaintiff Sanders notice that Koch would be cutting off his chickens in November.

> 61.  While the USDA's investigation was "ongoing" and the agency was coordinating with the Department of Justice ("DOJ"), the USDA attempted to mediate between Defendant Koch and Plaintiff Sanders.  In the months following the USDA's presentation in July 2017 to Koch's executives, the USDA negotiated with Koch to resume delivering chickens to Sanders' farms.

> 62.  Defendant Koch responded with a list of ten repairs that Plaintiff Sanders would need to make before Koch would resume delivering chickens.  Seven were among the twenty-three upgrades that Koch had previously insisted were optional.

> 63.  The USDA sought an assurance from Defendant Koch that if Plaintiff Sanders borrowed and spent the money to make the latest ten repairs, Koch would resume bringing Sanders's chickens (to avoid an exercise in futility).  Koch would not agree.  Koch would only agree to be "reviewing its policies and programs," meaning it would do and did nothing.

Defendants argue that no set of facts make the complaint timely filed under the state law claims.  However, Defendants do not acknowledge that they failed to properly terminate the

contracts with Sanders, failed to give him Broiler Service Reports (even as late as September 2018), impeded his ability to get additional funding, and led him into believing by September 21, 2017, that if he conducted ten of the upgrades mandated by the November 4, 2015 letter, they would resume re-delivery of chickens.

As alleged by Plaintiff Sanders and reported by the USDA, Defendants failed to properly terminate the contracts by serving Sanders with a 90-day notice of termination. On July 6, 2017 and through August and September of 2017, Defendants represented to the USDA that ten upgrades were needed to resume with the contracts. Defendants later failed to agree that it would deliver chickens if the repairs were made, even though this was eight more than Defendants claim were originally required of all the farmers. Defendants' breach of contract, fraud, and misrepresentation continued until at least September 21, 2017, according to the reports of the USDA, and further if you look at other intervening events, including the sale of the land in 2019 to a relative of Defendants' employees for $21,000 less than what Plaintiff Sanders's son was willing to pay.

Plaintiff Sanders was not afforded the opportunity by Defendants to make the proper changes to allow his compliance with the contracts due to the fraud and misrepresentations by Defendants through September 21, 2017, at a minimum. Defendants continued to breach the contracts due to their failure to terminate the contracts until the foreclosure sale to a relative of Defendants' employee by the lender in 2019. Sanders's breach of contract, fraud, and misrepresentation claims under state law were timely filed.[6]

---

[6]This case is analogous to the continuing violation doctrine applied by the Fifth Circuit in Title VII (hostile workplace) cases. Plaintiff Sanders was under Defendants power and control in every aspect of his growing operations. It is unreasonable to expect that Sanders would know to sue (Defendants were also ensuring his bankruptcy and inability to find an attorney willing to take his case) before each of the violations had expired. *See, e.g., Heath v. Bd. of Supervisors for the Southern University and Agricultural and Mechanical College, et al.*, No. 16-30625, p. 6 (5th Cir. 2017) (hostile workplace claims are continuing because they

## PLAINTIFFS HAVE STANDING TO ASSERT REGULATORY CLAIMS

Under Section 209 of the PSA, Plaintiffs have standing to file a lawsuit against Defendants in District Court for recovery of the full amount of damages suffered by Plaintiffs due to the violations of any chapter of the PSA or any order of the Secretary of Agriculture.  7 U.S.C. § 209. *See Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) (noting that "[a] Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well" and that it is therefore "meaningless to talk about a separate cause of action to enforce the regulations apart from the statute"); see also *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 54 (2007) ("[T]o violate a regulation that lawfully implements [a statute's] requirements is to violate the statute.").

## PLAINTIFFS CONCEDE SEVERAL SCRIVENER'S ERRORS IN CITATIONS TO THE PSA WHICH POSE NO PREJUDICE TO DEFENDANTS

Plaintiffs concede that a section of the PSA was incorrectly cited in several places and if it needs to be specifically corrected within the Amended Complaint, it can easily be remedied by allowing for an amendment to the Complaint, which should be freely given and does not prejudice Defendants in any way.  The PSA should be corrected with the proper cites as follows:  Where 7 C.F.R. § 201.200(a) is cited it should be 7 C.F.R. 201.100 in Doc. 8, ¶¶ 98, 102, 112, and 121. Where 7 C.F.R. § 201.53 is cited, it should be 7 C.F.R. § 201.100 in Doc. 8, ¶ 104.  Defendants are correct that 7 C.F.R. § 213 pertains to livestock and should not be cited in Doc. 8, ¶¶ 103, 109, 112, 120, 122(f), and 244.

Plaintiffs disagree that 7 C.F.R. 202.216 is incorrectly cited in Counts II and III.  7 C.F.R. 201.100 is correctly cited at Doc. 8, ¶¶ 102, 122(a)-(b).  Defendants may have included language

---

involve repeated conduct, so the 'unlawful employment practice' cannot be said to occur on any particular day), *citing National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-17 (2002).

contained in the PSA in the contracts, but they did not comply with the requirements.  Plaintiffs also included "all other relevant sections of the PSA" in its Amended Complaint [Doc. 8, ¶¶ 96, 105, 115, 116, and 120-123], covering all applicable sections of the PSA, which Defendants are keenly familiar with and have a much deeper insight into than Plaintiffs.

### PROVING THAT COMPETITVE HARM UNDER THE PSA IS LIKELY TO HAVE OCCURRED HAS NO PLACE UNDER THIS SET OF FACTS

Plaintiffs agree that the Fifth Circuit has set precedent regarding the anti-competitive effect in *Wheeler v. Pilgrim's Pride Corp.*, 591 F. 3d 355 (5th Cir. 2009).  As aforementioned, the *en banc* Court in *Wheeler* reversed a panel's prior ruling to avoid a circuit split and to allow the law to be "predictable and consistent." *Id.* at 363.  However, Plaintiffs would be extremely remiss if they failed to argue that the anti-competitive effect is not an essential element that needs be alleged to state a claim for a violation of 7 U.S.C. § 192(a)-(b).  *See M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, No. 2:15-cv-00032-JPB, at *28 (N.D. WV 2015) (Exhibit 5).  Plaintiffs understand that *M&M Poultry, Inc. v. Pilgrim's Pride Corp.* sets no precedence upon this Court.  However, Judge Bailey compares the circuit opinions and sides with the dissenting opinion of Judge Garza in the *Wheeler* case.  *Id.* at *13-28.  Proof of competitive harm should not be necessary component in this case.

### IF PROVING COMPETITIVE HARM IS A MANDATORY COMPONENT OF THE PSA CLAIMS UNDER THIS SET OF FACTS, IT HAS BEEN PROPERLY PLEADED

As laid out in the Amended Complaint [Doc. 8, ¶¶ 20, 21, 22, 23, 25, 26, 740], the poultry industry is the largest income-producing agricultural commodity in Mississippi.  Total sales of poultry products by Mississippi processors in 2014 exceeded $2.87 billion, and Mississippi produced 738 million broilers in 2014.  Mississippi is the fifth largest poultry producing state, with more than 1,300 chicken farms.  While the population in Mississippi is 38% black, only 96 of

those farms were operated by blacks in 2012, according to the most recent available data. From 2009 to 2017, Defendants went from having contracts with four black farmers in Mississippi to one, Plaintiff Sanders, to none, out of 173 Defendant Koch growers. Defendants have a history of discriminating against black contract farmers in Mississippi and retaliating against those who speak out. Investigators for the USDA have found evidence of "unjust discrimination" against Plaintiff Sanders and other black farmers by Defendants.

The USDA investigated the complaint of black farmer John Ingrum against Defendants stretching back to 2010. Ingrum, like Plaintiff Sanders, was subjected to a series of unlawful and unwarranted shifting demands by Defendants. Evidence compiled by the USDA shows Defendants using pretextual reasons against Ingrum, who was the next-to-last black farmer terminated before Sanders to grow for Defendants in Mississippi.

In addition to unlawful and unwarranted shifting demands placed upon Sanders, Defendants orchestrated the demise of Sanders, so that relatives of Defendant Koch employees could buy Plaintiff Sanders's property for over $21,000 less than Sanders's son, Cory M. Sanders, offered to pay for it. Defendants unjust discriminatory and deceptive practices are likely to harm competition by prohibiting other potential black farmers and the son of Sanders from entering the contract chicken growing business. *See, e.g., Breaking Free, LLC v. JCG Foods of Ala., LLC*, No. 4:18-cv-01659-ACA at *13 (N.D. Ala. 2019) (Exhibit 4).

The Amended Complaint [Doc. 8, ¶¶ 72, 76, 123] addresses the issue of competitive harm in the antitrust context, but it is difficult to put in words without offending a population of people that deserve better. Experts will be best equipped to calculate how Defendants have gained a monetary edge over their competitors through their systematic elimination of black farmers to grow chickens for their companies. Yet, this case also tells the story of a poultry farmer, the last

black poultry farmer growing for Defendants, who was unfairly discriminated against by Defendants, a billion dollar food integrator, who controlled every aspect of his two farm poultry growing operations, while he bore all the risk.  In view of the history of racism, particularly in Mississippi, this final elimination of its black farmers gave Defendants an unfair advantage and a perception in the industry of a competitive edge over their competitors (despite how repugnant this notion is).  Plaintiffs have properly pleaded competitive harm.

### THE AMENDED COMPLAINT IS THE ANTITHESIS OF A "SHOTGUN" PLEADING AND SUPPORTS THE CLAIM OF FRAUD

Defendants' citation to an order granting a motion to dismiss Count IV (fraud), citing *Cascade Capital Grp., LLC v. Livingston Holdings*, LLC, No. 3:17-cv-952-LG-FKB, 2018 WL 4288706, at *2 (S.D. Miss. July 31, 2018), has no relevance in this case.  *Carter* is not only distinguishable because it deals with counter and third-party claims, but its references to "shotgun" pleadings has no place here.  This case is rich with evidence of fraud and misrepresentation and is pleaded in compliance with Rule 9(b) of the Federal Rules of Civil Procedure to defeat the motion to dismiss.  It is instructive to steer this Honorable Court toward a district court opinion that analyzes the application of a fraud claim in a parallel context and finds that it was pleaded with enough specificity under Federal Rule of Civil Procedure 9(b) to survive Defendants' Motion to Dismiss.  *See Morris v. Tyson Chicken, Inc.*, Case 4:15-cv-00077, Doc. 31, pgs. 12-16 (W.D. Ky, November 13, 2015) (Exhibit 8).

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Respectfully submitted on this the 3rd day of January, 2020.

                                                                           Plaintiffs Represented:

                                                    By:    /s/*Elizabeth A. Citrin*
                                                                       Elizabeth A. Citrin (101368)
                                                                       Attorney for Plaintiffs

Elizabeth A. Citrin, Esq.
Elizabeth A. Citrin, P.C.
28311 N. Main Street, Suite B-103
Daphne, AL 36526
Phone:  251-626-8808
Fax:  251-626-8860
Email:  elizabeth@elizabethcitrin.com

                                                                   By:    /s/ *Adam Sanford*
                                                                       Adam Sanford (103482)
                                                                       Attorney for Plaintiffs

G. Adam Sanford, Esq.
McRaney & McRaney
503 Springridge Road
P.O. Box 1397
Clinton, MS 39060
Phone:  601-924-5961
Fax:  601-924-1516
Email:  g.adamsanford@gmail.com

## **CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing document was filed using the Court's electronic filing system, which sent notification to all registered counsel of record on this the 3rd day of January, 2020.

                                                                        s/*Elizabeth A. Citrin*
                                                                       Elizabeth A. Citrin