UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

STEPHEN H. SMITH AS CHAPTER 7 BANKRUPTCY
TRUSTEE FOR CARLTON SANDERS                                                                    PLAINTIFF

V.                                                                         CIVIL ACTION NO. 3:19-CV-721-DPJ-FKB

KOCH FOODS, INC.; KOCH FARMS OF MISSISSIPPI, LLC;
AND KOCH FOODS OF MISSISSIPPI, LLC                                                    DEFENDANTS

ORDER

This civil action relates to alleged discrimination by Defendants Koch Foods, Inc.; Koch Farms of Mississippi, LLC; and Koch Foods of Mississippi, LLC (collectively "Koch") against Carlton Sanders, an African-American poultry farmer under contract to grow broiler chickens for Koch. Specifically, Sanders says Koch refused to deliver flocks of chicks for him to grow unless Sanders made expensive upgrades to his chicken houses that white growers were not required to make. Sanders asserts claims of race discrimination under 42 U.S.C. § 1981 and breach of contract. Koch seeks summary judgment on both claims; its motion is denied.

I.      Facts and Procedural History

Koch is a poultry processor that contracts with approximately 170 independent broiler-chicken farmers to raise chicks born in Koch's Mississippi hatcheries. Koch's Live Operations department, led by Ronnie Joe Keyes, oversees this process. Two Broiler Managers, Max Sessums and Joe Bergin, are each responsible for one half of the growers. When the farmers receive chicks from Koch, they grow them in one of two classes of houses–Class B (also referred to as "Base houses") and Class A houses. Class A houses must meet stricter standards than Class B houses, and growers operating Class A houses receive a higher price per pound.

Sanders operated Class B chicken houses on two farms under separate contracts with Koch, both now disputed.  Sanders signed the Cory Sanders Farm contract [158-11] on August 12, 2013, and the Carlton Sanders Farm contract [158-10] on March 18, 2015.  A dispute soon followed, precipitated by three key events:  (1) Sanders borrowed $110,000 in September 2014 to perform 22 upgrades Koch required and another $25,000 in February 2015 to replace warming devices (called brooders) after a fatal cold-weather event; (2) Koch changed its minimum housing requirements in February 2015; and (3) Koch issued a letter to Sanders in November 2015 detailing 23 upgrades to his chicken houses.

A. September 2014/February 2015 Upgrades

On September 9, 2014, Koch sent Sanders a letter detailing 22 improvements that were needed on the Carlton Sanders Farm "prior to placement" of birds.  Letter [158-15].  Sanders incurred $110,000 in loans and performed these upgrades in the fall of 2014.  Pl.'s Mem. [159] at 6.  Chicks were then placed with Sanders in January 2015.

On January 9, 2015, three days after the chicks were delivered, Broiler Service Technician Todd Williams made a routine stop at the farm.  Williams found a large number of dead birds and determined that the chicken-house temperatures were too low.  Williams Dep. [140-5] at 146–47.  Koch and Sanders concluded that several of the brooders were not functioning properly, and Sanders agreed to replace them in all houses.  Sanders Dep. [140-7] at 217–18.  He borrowed another $25,000, replaced the brooders, and resumed receiving chicks.  Pl.'s Mem. [159] at 20.

B. Koch Housing Requirements

Around this same time, Koch revised its housing standards.  By letter dated February 2, 2015, Keyes listed four changes, including a "[m]inimum static pressure requirement of .10" "to

be completed for placements starting November 1, 2015." Letter [140-8]. In laymen's terms, the static pressure measures how airtight the chicken houses are, which impacts things like internal temperatures. Williams Dep. [140-5] at 128. Previously, a static pressure of 0.05 was required, and Sanders admitted that his existing housing did not meet the new 0.10 static-pressure requirement. Sanders Dep. (Vol. II) [158-23] at 14.

On February 20, 2015, Bergin, Williams, Keyes, and Sanders met to review the January 2015 cold-weather mortality event. The new minimum specifications were discussed, as well as the steps necessary for Sanders to upgrade from Class B to Class A housing. Memo [140-10]. A February 26, 2015 memo memorializing the meeting stated:

> Also discussed with Mr. Sanders were the new minimum house specifications that Koch Foods has implemented. A letter was mailed to all growers notifying them of the new specifications on February 13[,] 2015. These specifications will go [into] effect November 2015 for all growers in Live Operations. We also discussed with Mr. Sanders about the possibility of upgrading these houses to Class A specifications this would also give a pay increase from .0500 to .0575.

*Id.* Keyes, Bergin, Williams, and Sanders signed the memo. *Id.*

Because the static pressure cannot be tested with birds in the houses, Koch caught Sanders's last flocks on November 4, 2015 (Cory Sanders Farm) and November 17, 2015 (Carlton Sanders Farm). Koch then waited for Sanders to announce that his houses met the new static-pressure requirement. *See* Keyes Dep. [140-1] at 200. According to Koch, it was "[Sanders's] responsibility to prepare the houses[] to test for static pressure" and inform Koch when he was ready for testing. *Id.* That never happened, so no additional birds were delivered.

C. November 2015 Letter

The parties' stories diverge sharply at this point, framing the factual dispute at the heart of this case. According to Koch, Sanders asked for a list of upgrades necessary to "go to premium," meaning Class A housing. Williams Dep. [140-5] at 174. Koch responded with a

letter dated November 4, 2015.  Letter [158-24].  The letter is titled "Update list on Carlton and Cory Sanders Farm" and lists 23 upgrades.  *Id.*  Item 12 addresses the static-pressure requirement and states that the houses "[m]ust have a static pressure of .10 with one 48" fan."  *Id.*  Koch says this list reflected *optional* upgrades to move from Class B to Class A housing and that the only mandatory upgrade to retain Class B status was the increase in static pressure.  It insists that if Sanders had met the 0.10 static-pressure requirement and performed no other upgrades, he would have received more birds.

Sanders, on the other hand, believed he was required to complete this entire list of 23 upgrades before Koch would deliver another flock.  He testified that Williams said, "This is what you've got to do before you get birds back on your farm"—"all 23 of these items."  Sanders Dep. [140-7] at 242; *see* Sanders Dep. (Vol. II) [158-23] at 19 (testifying Bergin said, "You know all those 23 items have to be done before we can place chickens out here.").

The Trustee notes that the November 2015 letter uses the term "must" seven times and nowhere uses the term "Class A" or "premium" housing.  He contrasts that with a similar letter to another grower that began, "This letter is requested to be retrofitted for Class A specifications by Mr. Schaffer for the current Kobi and Jeremy Farm."  Bergin Dep. [140-4] at 246.  Bergin agreed that this letter told "the farmer if you want to go Class A, here's what you have to do."  *Id.* at 247.  And he conceded that the November 2015 letter to Sanders "could have been clearer."  *Id.*; *see* Williams Dep. [140-5] at 174–75 (agreeing that Sanders's letter does not state that it relates to Class A requirements).

> Sanders estimated the cost of the 23 improvements at $188,700 and explained,
>
> "Because I owe a great deal of money on my farms, much of it due to the required items that I had to replace in 2014, I believed I had no choice but to try and borrow more money to make the 23 upgrades that were listed in the November 4, [2015], letter."

4

Sanders Aff. [140-14] at 4.  Sanders took the estimate to his banker, who told him "the bank could not loan []the additional money to make the 23 upgrades[] and suggested that [he] consider selling [his] farms."  *Id.* at 5.  A United States Department of Agriculture investigator later "learned that no other growers had received a list of demands like the one that Mr. Sanders received."  Basford Dep. [140-15] at 57.  Notably, Sanders was Koch's only African-American grower at that time.  *Id.*

In short, Sanders claims that—unlike white poultry farmers—Koch told him to make all 23 upgrades before he could receive any additional birds.  Koch says the 23 upgrades were necessary to reach the Class A standards applicable to all Class A growers, but that Sanders would have received more chicks by merely fixing the static pressure required for Class B housing.  Def.'s Mem. [141] at 11 (citing depositions of Williams and Bergin).

Sanders declared bankruptcy in 2018, and, in 2019, his farms were sold.  Am. Compl. [8] at 19.  He filed this suit in 2019, but it became property of the bankruptcy estate and is now pursued by Trustee Stephen H. Smith.  Federal-question jurisdiction exists over the dispute, and the summary-judgment motion has been fully briefed.

II.     Summary-Judgment Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant."  *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

III.    Analysis

Koch seeks summary judgment on the Trustee's § 1981 race-discrimination and breach-of-contract claims; all other claims were previously dismissed.  The Trustee opposes the motion.

    A.    Race Discrimination

Section 1981 race-discrimination claims "are analyzed under the familiar *McDonnell Douglas* burden-shifting analysis."  *Morris v. Town of Independence*, 827 F.3d 396, 400 (5th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)); *see Sanders v.*

*Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). First, the plaintiff must establish a prima facie case of discrimination by showing: "(1) membership in a protected class; (2) that they sought and were qualified to receive an available contract; (3) that their contract proposal was rejected or that they received a contract on unfavorable terms; and (4) similarly-situated individuals or entities not in the protected class received a contract." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 387 n.1 (5th Cir. 2017) (citing *Jeffrey v. Columbia Med. Ctr. at Lancaster Subsidiary LP*, No. 01-10178, 2002 WL 31016499, at *5 (5th Cir. Aug. 15, 2002)).

Once a prima facie case is established, "the burden of production then shifts to the defendant to provide a legitimate and nondiscriminatory reason for its actions." *Baker v. Wal-Mart Stores East*, No. 21-60696, 2022 WL 1078030, at *2 (5th Cir. April 11, 2022). "Where a defendant meets its burden, the plaintiff then must show by a preponderance of the evidence that the reasons offered by the defendant were pretext." *Id.* Ultimately, the plaintiff "bears the burden of showing that race was a but-for cause of [his or her] injury." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

The Trustee frames the race-discrimination claim as follows: "Sanders asserts that Koch terminated his contracts because of his race by imposing twenty-three expensive requirements and threatening to cut him off if [he] did not comply with all of them." Pl.'s Mem. [159] at 15. Koch, on the other hand, contends that it ceased providing additional flocks to Sanders only because he did not meet the 0.10 static-pressure requirement applicable to all Class B growers and that the 23 upgrades were the requirements for Class A housing. Def.'s Mem. [141] at 8, 16.

Koch's position is not without some support. As examples, Koch says white farmers ceased receiving flocks when they, too, failed to meet the static-pressure requirement. *Id.* at 13. And Koch notes that it prepared a memorandum on February 26, 2015, documenting its

7

discussion with Sanders regarding the static-pressure requirements and further noting: "We *also* discussed with Mr. Sanders about the possibility of upgrading these houses to Class A specifications." Memo [140-10] (emphasis added).

But that's just one side of it. Even assuming Koch separately discussed Class A and Class B requirements with Sanders in February 2015, that discussion occurred nine months before Koch wrote Sanders the letter with the 23 upgrades. Unlike Koch's letters to white growers, the letter Sanders received in November 2015 did not say the upgrades were necessary for Class A designation; it merely listed them. Letter [158-24]. Moreover, Sanders testified that Koch told him upon delivery of the November 2015 letter, "This is what you've got to do before you get birds back on your farm." Sanders Dep. [140-7] at 242; *see also* Sanders Dep. (Vol. II) [158-23] at 20–21 (testifying that he was told, "All 23 things on this list have to be completed"). According to Koch, its witnesses deny Sanders's assertion, *see* Def.'s Mem. [141] at 11, but that merely crystalizes a key disputed fact.

Sanders has created a question of fact whether Koch required him to meet Class A standards before receiving additional flocks. He has likewise offered evidence that white farmers were not required to meet those same standards as a precondition for doing business. Sanders Aff. [158-6] at 4 ("I have also talked with other Koch growers about Koch's demand that I make the 23 upgrades. None of the other growers that I spoke with had received such demands."); USDA Report [158-37] at 2 ("No other poultry growers under contract with Koch received a similar letter."). Accordingly, Sanders has created a question of fact at the pretext stage. *See Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (holding that race-discrimination plaintiff may establish pretext "through evidence of disparate treatment"). Finally, Koch cannot overcome this result by pointing to the white farmers it cut off for failing to

meet the static-pressure requirements for Class B housing. Unless Koch required those farmers to meet Class A requirements before receiving new flocks, they are not similarly situated with Sanders.

While Koch will have the opportunity to prove its factual arguments at trial, the Court may "not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. Thus, drawing "all reasonable inferences in favor of the nonmovant," summary judgment on the race-discrimination claim is inappropriate. *Rite Way Serv.*, 819 F.3d at 239.[1]

B.     Breach of Contract

"A breach-of-contract case has two elements: (1) the existence of a valid and binding contract, and (2) a showing that the defendant has broken, or breached[,] it." *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 743 (Miss. 2019) (internal quotation marks and citation omitted). The parties agree that two contracts existed. But Koch maintains that it did not breach those contracts by failing to provide chicks because Sanders failed to meet the new 0.10 static-pressure requirement.

---

[1] In response to Koch's motion, the Trustee raises, for the first time, a "Section 1981 Retaliation Claim." Pl.'s Mem. [159] at 15. After introducing the relevant law, the Trustee includes one paragraph of analysis, claiming Koch retaliated against Sanders for filing a complaint with the USDA by *continuing* to require the 23 upgrades, with no citation to record evidence. *Id.* at 16. To begin, a separate retaliation claim is not apparent from the Complaint. *See Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."). Moreover, as Koch points out, the Trustee cannot show a causal connection because the alleged adverse action occurred both before and after the alleged protected activity. Def.'s Reply [162] at 11; *see Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 390 (5th Cir. 2017) (finding no causal connection where "the Complaint alleges that Defendants refused to contract with Plaintiffs both before and after Plaintiffs complained about racial discrimination"). A retaliation claim is not properly before the Court; alternatively, it is due to be dismissed.

9

Under the applicable contracts, Sanders was required to follow Koch's Broiler Growing Program, which could "be amended or modified from time to time at [Koch's] sole discretion." Carlton Sanders Contract [158-9] at 2 (¶ 2.B.); *see id.* (¶ 2.D.); *id.* at 4 (¶ 11); *see also* Cory Sanders Contract [158-11] (same).  Thus, Koch reasons that it changed its policies regarding the static-pressure requirement in November 2015, and when Sanders failed to comply, he was no longer eligible to receive birds under the contracts.

Perhaps, but that short-changes the Trustee's evidence that Koch conditioned delivery of flocks on the 23 upgrades—not just the one related to static pressure.  Pl.'s Mem. [159] at 31 ("Sanders's contention that Koch was making him do another cluster of twenty-three expensive upgrades to push him out because he is black and in breach of his contracts.").  In other words, Koch contends that the 23 upgrades were not required under the contract to meet minimum housing specifications to receive new flocks, yet there is a factual dispute whether Koch refused to provide new birds until Sanders made those same upgrades.

Like the race-discrimination claim, the breach-of-contract claim touches on conflicting testimony and questions of fact.  Summary judgment is therefore denied.  *See Occu-Health, Inc. v. Miss. SpaceServices*, No. 1:06-CV-159-HSO-JMR, 2008 WL 2037443, at *4 (S.D. Miss. May 9, 2008) ("Because resolution of Plaintiff's breach of contract claim rests upon disputed questions of fact, partial summary judgment in Plaintiff's favor is inappropriate."); *Saucier v. Coldwell Banker JME Realty*, 644 F. Supp. 2d 769, 782 (S.D. Miss. 2007) (noting "[a]s to the breaches alleged, the record, taken as a whole, reflects contradictory testimony from parties on both sides," and finding "[b]ecause of such inconsistencies, material questions of fact remain as to whether any breaches occurred . . . and summary judgment cannot be granted").

C. Mitigation of Damages

Lastly, Koch argues that the Trustee should not recover because Sanders failed to mitigate his damages, insisting that all he had to do was bring his houses to a static pressure of 0.10 to receive birds. Def.'s Mem. [141] at 21–22. Koch also notes that Sanders could afford those limited improvements. *Id.* at 21. But, again, this argument reflects only Koch's theory and is contradicted by Sanders's testimony that he would not receive new birds unless he made all 23 updates. *See, e.g.*, Sanders Dep. (Vol. II) [158-23] at 20–21. Sanders says he could not afford that. Sanders Aff. [140-14] at 4–5.

> While generally an injured person has the duty to use reasonable care, and to make reasonable effort to prevent or minimize the consequences of the wrong or injury, the rule is one of reason and that, where funds are necessary to meet the situation and the injured person is without the funds, he is excused from the effort.

*Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 738–39 (Miss. 1999) (cleaned up). Because a question of fact exists regarding the repairs Sanders was required to make, summary judgment based on a failure to mitigate is denied.[2]

IV. Conclusion

The Court has considered all argument raised by the parties; those not addressed would not have changed the result. Defendants' motion for summary judgment is denied.

**SO ORDERED AND ADJUDGED** this the 2nd day of June, 2022.

s/ *Daniel P. Jordan III*  
CHIEF UNITED STATES DISTRICT JUDGE

---

[2] Koch says the Trustee conceded its argument by failing to address it in response. It is certainly true that this Court and others have found waiver when a non-movant failed to respond to an argument under Rule 56. But it does not appear that the Trustee intentionally abandoned his claim to all damages. While the Trustee may have been sloppy, he clearly seeks damages and offered record evidence and arguments that create a fact question whether fixing the static pressure would have resulted in resumed operations. Accordingly, the Court exercises its authority under Rule 56(e)(4) and denies this portion of the motion.